NETTIE E. WILSON, Appellant, v. JOHN WILSON AND
A. H. HAUSMAN.

**Evidence:** PAROL GIFT OF LAND: *Possession.* A parol gift of land
by father to son, is not shown by evidence that the father stated
after the marriage of his son, that he intended to give him the
land, but would retain the deed until the son became of age,
though he gave the son the entire management of the land, after
having put him in possession, and permitted him to lease the land
and receive the rents.

*Appeal from Des Moines District Court.*—HON. JAMES
D. SMYTH, Judge.

WEDNESDAY, OCTOBER 28, 1896.

ACTION in equity to enforce an alleged parol gift
of a certain eighty acres of land, made by the defend-
ant, James Wilson, and to cancel a conveyance of said
land made by him to the defendant, Hausman.
Defendants answered separately, denying the alleged
gift, and averring that the land is the property of the
defendant, Hausman. Decree was entered dismissing
plaintiff's petition, from which she appealed. —
*Affirmed.*

*P. Henry Smyth* and *A. M. Lewald* for appellant.

*W. W. Dodge* and *A. H. Stutsman* for appellees.

GIVEN, J.—I. The sole contention is whether the
evidence establishes the alleged gift. The following
facts are undisputed: Some time prior to September
15, 1886, the defendant Wilson became the owner of
the land in controversy, by purchase, for the consid-
eration of three thousand five hundred and fifteen
dollars, and took title to himself. On September 15,

1886, his son, an only child, Jacob Wilson, then in his nineteenth year, was married to the plaintiff, she then being nineteen years of age. They were married at her father's home, and John Wilson and his wife, though opposed to the marriage, attended the wedding, and left soon after the ceremony. On the next day Jacob Wilson and the plaintiff went to the home of his parents to live, and remained there until March 1, 1887, when they went to live upon the farm in question. John Wilson provided his son with implements and other necessaries for working the farm, and Jacob and his wife remained thereon, and worked the same for four years, during which time Jacob made certain improvements, such as repairs on the house, sheds, fences, well, and putting in tile drains. On March 10, 1891, Jacob, by written lease, let the farm to one George Drinkall for one year, for the rental of two hundred and sixty dollars. On February 10, 1892, these persons executed a new lease, for another year, from March 1, 1892, at the same rent, and on August 22, 1892, they entered into the third lease, for another year, from March 1, 1893, the rental being two hundred and seventy-six dollars and fifty cents. The defendant, Wilson, knew that Drinkall was occupying the land under these leases, and paying the rent to Jacob Wilson. March 1, 1891, Jacob, his wife, and two children that had been born to them, left the farm, and removed to the town of Morning Sun, where he engaged in the business of keeping a restaurant. In February, 1893, Jacob abandoned his wife and children, went out of the state, and has ever since lived apart from his wife. On March 9, 1893, defendant Wilson called upon the defendant, Hausman, and offered to sell him this land. Hausman purchased the land for four thousand and forty dollars, and received a deed therefor from Wilson, executed March 25, 1893, in which the consideration is recited

at four thousand and forty-eight dollars and fifty cents. Prior to October 3, 1893, this plaintiff filed her petition for a divorce from her husband, Jacob Wilson, upon the ground of adultery. On October 3, 1893, a default was entered against Jacob Wilson, and a decree entered dissolving the marriage relation, and giving custody of the two children to Mrs. Wilson. The land in question was decreed to her, by description, as alimony, free from all claims or control of Jacob Wilson. Plaintiff alleges in her petition as follows: "That about the time of their marriage the defendant, John Wilson, father of said Jacob, purchased said farm for his said son, and presented the same to him for a homestead, and the gift was duly accepted; and in pursuance thereof the said Jacob and this plaintiff moved upon the said farm, and, with the knowledge and consent of the said John Wilson, lived there, occupied it, made improvements upon it, paid taxes, and held it as the property of Jacob, it being known and understood that he was the owner thereof." The evidence relied upon to support the alleged gift is, in substance, as follows: The plaintiff testifies that on the first evening after she and her husband came to the defendant Wilson's home to live, John Wilson, his wife, and the plaintiff and her husband were reading the list of wedding presents, and estimating their value, and that John Wilson said "his present would be larger than all the rest. I asked him what it was, and he said it was the eighty-acre farm, and told me where it was. He said he would hold the deed until Jacob was twenty-one; he did not want him to sell the land. That was the substance of what was said then." It was talked about frequently afterwards by John Wilson and others. She further states that on the day after John Wilson moved them he said, "he would like to see us make as much money as he had. He started with nothing, but we started with eighty acres." She further

states that John Wilson was there often, and never said anything different. "He never indicated any purpose in putting us on the farm but to give it to us." George Hutchcroft testifies that, soon after John Wilson bought this farm, "I said to him, 'I heard you bought the farm.' He said, 'Yes, I bought it for Jake.'" He also testifies that at another time Wilson said "he was not going to give the deed for a while, and I said, 'If I were you, I would not give him a deed yet.'" He states that the first talk was before Jacob's marriage. Arthur Hull testifies that in a conversation with John Wilson in 1892, Wilson said he would not have George Drinkall on a place of his; that he (Hull) spoke to Wilson about getting the place, as he was a renter, and that Wilson said "he did not have anything to do with it." The place was Jake's, but he would not have Drinkall on a place of his. W. H. Thompson testifies that in a conversation with John Wilson, three or four years prior to giving his testimony, "he told him he bought this place for his son, but had not deeded it yet; he wanted to see how he would handle it." George Drinkall testifies that while he occupied the farm under the leases he paid rent to Jacob Wilson; that John Wilson was there several times, and knew he was occupying the farm; and that the first he heard of anyone claiming the farm except Jacob, was in the spring of 1893, when Hausman claimed it. Alfred Drinkall testifies that during the second year that Jacob lived on the farm he worked some by the day for Jacob; that one day "John Wilson said Jake had a good show there; that he bought the place, and gave it to him, and did not see what better show he could want." L. W. Hayes testifies: "I had a conversation with John Wilson about a year ago, here in Burlington, about the ownership of that land. In that conversation he told me he had given them about four thousand dollars. I asked him how,

and he said: 'That farm up there,' and set them up in business; and he says: 'He won't stay on it.' The way it came up was, I met him on Main and Jefferson streets, and he asked me if I knew where Jake was. It seems he had not been home for some time, and he was looking for him, and asked if I knew where he was staying." The defendant, John Wilson, his wife, and Jacob, each deny that on the next night after the marriage, John Wilson said anything about giving Jacob the land, and John Wilson substantially denies the statements of the other witnesses as to declarations made by him. He and Jacob testified to the effect that Jacob occupied the farm under an oral agreement to pay a rental of one hundred and twenty dollars a year,—one hundred dollars in improvements and twenty dollars in money; that the improvements were made, and money paid, and that a settlement was had between them each year. Two witnesses testified that Arthur Hull said that John Wilson never had any conversation with him about the case; that what he knew he got from Murphy.

II.   The law is well settled (and is not questioned in this case), that the burden is upon the plaintiff to establish the alleged gift; that "the evidence of the gift must be direct, positive, express, and unambiguous," and must show that the gift has been completely executed. "It is, therefore, necessary to the validity of a gift, that the transaction be fully completed; that nothing essential remains undone." 8 Am. & Eng. Enc. Law, 1313. *Shellhammer v. Ashbaugh*, 83 Pa. St. 24. If we leave out of consideration the testimony on behalf of the defendant, we think the plaintiff has failed to establish the alleged gift by the weight of evidence that the law requires. It is evidently not true, that defendant, John Wilson, purchased this land in anticipation of his son's marriage, for it appears that he purchased it a considerable time prior

to the marriage, and prior to the time that he knew of his son's intention to marry. In *Robertson v. Robertson,* 9 Watts, 42, it is said: "Parental declarations are often made with reference to experimental arrangements, or testamentary intentions, for the benefit of a son, which are sadly misapplied when brought into court as evidential of a contract of sale." The same may be said, we think, as to parental declarations as evidence of a gift. While John Wilson, no doubt, had in mind, that ultimately his son should have this farm, we think there was no present purpose to absolutely and unqualifiedly vest him with the title; that, while John Wilson intended that his son should have the use and benefit of the farm for an indefinite period, it was not his intention to part with the title to the farm, or the right to ultimate control of it. His statement that he would withhold the deed until Jacob was twenty-one, because he did not want Jacob to sell the land, shows quite conclusively that it was not a complete gift, and that by putting Jacob in possession John Wilson did not intend to part with all title and control over the property. His statement that these children started with eighty acres, while he started with nothing, is consistent with his purpose that they should have the use of the land. The statement that he had bought the land for Jake, but was not going to give him a deed for a while, falls far short of showing a gift; and the statement that he had nothing to do with the land is explained by the fact that he had given the use of the land to Jacob. The statement to Mr. Thompson that he had bought the place for his son, but had not deeded it yet, that he wanted to see how he would handle it, explains the situation, and shows clearly that it was at most but a contemplated, and not a completed gift. The fact which to our minds tends most strongly to establish the gift is

that Jacob was permitted to rent the farm to another, and to collect the rent; yet this is entirely consistent with the purpose of allowing Jacob the benefit of the use of the farm, or of such rental as he could get in excess of that which he was to pay. As we are of the opinion that the plaintiff has failed to establish the alleged gift, we need not determine whether or not the claim that the land was rented to Jacob is true. The plaintiff having failed to establish the alleged gift, we think her petition was properly dismissed.—AFFIRMED.