Argued January 15, decided February 3, 1914.

## THAYER *v.* THAYER.*

(138 Pac. 478.)

**Husband and Wife—Husband as Agent of Wife—Authority.**

1. Where the legal title to land is taken in the name of a wife, and the purchase price paid with her money, she cannot be divested of title by any promises or statements of her husband without her knowledge, or actual or implied authority from her.

**Specific Performance — Agreements Enforceable — Promise to Give Land.**

2. Where the evidence clearly shows a promise to make a gift of land, it will be enforced in equity if complied with by the donee taking possession and making valuable improvements.

**Specific Performance—Evidence—Sufficiency.**

3. Evidence *held* to show that defendants did not make the alleged promise to give land to plaintiffs which plaintiffs seek to enforce.

**Adverse Possession—Hostile Character of Possession—Entry by Permission.**

4. Plaintiffs, claiming title to land by parol gift from defendants, do not gain title by adverse possession, where the original entry was merely permissive.

From Washington: JAMES U. CAMPBELL, Judge.

———

*On the question of the right of one in permissive possession of real property to acquire title by adverse possession, see note in 12 L. R. A. (N. S.) 1140.        REPORTER.

Department 1.   Statement  by  Mr.  Chief  Justice
McBride.

This  is  a  cross-bill  in  equity  by  Oscar  Thayer  and
Cassie G. Thayer against Emily M. Thayer and Walton
Thayer  to  restrain  the  prosecution  of  an  action  of
ejectment, arising  out  of  the  following  facts:

On  the  16th  day  of  October,  1911,  the  defendant
Emily  M.  Thayer,  who  is  the  wife  of  Walton  Thayer,
commenced an action in ejectment against these plain-
tiffs to recover possession of a tract of land in Wash-
ington County, which for convenience will hereafter
be referred to as the Ridgeway place.   Thereafter the
defendants in the ejectment action filed a cross-bill in
equity against Emily M. Thayer and Walton Thayer
to restrain the action at law, and to compel these de-
fendants  to  convey  to  them  the  premises  in  dispute.
Their  claim  for  such  equitable  relief  is based  upon
allegations, in  substance, that  in  October,  1898,  the
defendants,  with  the  intention  of  making  a  payment
to  Oscar  Thayer  of  a  debt  due  him  from  Walton
Thayer, and with the further purpose of making plain-
tiffs  a  gift  of  the  premises  in  dispute,  promised  and
agreed  to  purchase  for  plaintiffs  a  farm,  and  to  pay
$1,100 for the same; and by means of such promise in-
duced  plaintiffs  to  surrender  and  leave  a  farm  situ-
ated in the State of Washington which they owned, and
which by diligence and frugality they could have paid
for and accumulated considerable wealth, and to agree
to go upon the farm which defendants so promised and
agreed  to  purchase  for  them.    That  pursuant  to  said
agreement  the  defendants  purchased  the  Ridgeway
farm for $1,100, and, instead of taking the conveyance
in the name of plaintiffs, or either of them, caused the
conveyance  to  be  taken  and  recorded  in  the  name  of
Emily  M.  Thayer.    That  immediately  thereafter  the
plaintiffs took possession of said farm, and have, ever

since that time, been in possession, in accordance with said agreement, and thereupon waived and abandoned all their interests in the farm situated in the State of Washington. That plaintiffs have expended in work, labor and money in improving said Ridgeway place the sum of $3,500. That they have been in adverse possession of the premises for more than 10 years.

The defendants answered by a general denial, and set up title and right to possession of the premises in Emily M. Thayer. There was a decree for plaintiffs, and defendants appeal.

                    REVERSED: DECREE RENDERED.

For appellants there was a brief over the names of *Mr. E. B. Tongue* and *Messrs. Evans & Jacobson,* with oral arguments by *Mr. Tongue* and *Mr. W. H. Evans.*

For respondents there was a brief over the names of *Mr. Cicero M. Idleman* and *Messrs. Bagley & Hare,* with oral arguments by *Mr. Idleman* and *Mr. Geo. R. Bagley.*

Opinion by MR. CHIEF JUSTICE McBRIDE.

1, 2. The legal title to the land in question was taken in the name of the defendant Emily M. Thayer, and, the purchase price having been paid with her money, she cannot be divested of such title in this suit by any promises or statements made by her husband without her knowledge, or actual or implied authority given by her, or by such promises made by her personally. It has been the settled law in this state since the case of *Barrett* v. *Schleich,* 37 Or. 613 (61 Pac. 792), that agreements of the character described in plaintiffs' complaint will be enforced in equity if complied with by the donee taking possession and making valuable improvements. The fact that the plaintiffs went into possession and made improvements is fully established,

and, if they have proved the agreement alleged by them by the character of evidence required in such cases, they are entitled to the relief demanded.

3. We will now consider the evidence bearing upon that proposition. As to the situation of the parties the evidence tends to show that Walton Thayer, who is a brother of Oscar Thayer, had for some years prior to the alleged agreement been in poor circumstances, but, by reason of having drawn a prize of $15,000 in a lottery, became possessed of some means. He had given his brother Oscar $1,000 as a solatium to compensate him for drawing the tainted money in his own name, and had given $3,000 to his mother and $500 to another relative. There remained about $10,500, with which he went east and married his wife, Emily, who, it appears, was in fairly comfortable, if not affluent, circumstanes. The plaintiffs had purchased a farm near Washougal, Washington, about two years before the alleged agreement, taking a deed for it and giving a mortgage for something over $4,000, drawing 6 per cent interest, payable annually; no money having been paid down on the purchase. They had been unable to pay the interest, which was two years in arrears, and it seems plain that they were in a position where they would be very likely to lose the place and the labor spent upon it. In 1898 Walton and Emily visited them, and, according to their statement, made the agreement upon the faith of which they entered into possession of the farm.

Cassie Thayer, one of the plaintiffs, testified as follows:

"Q. Did you have any conversation with her concerning the purchase of the farm?

"Yes, sir; just one.

"Q. Just relate that.

"A. It was on the second day she was with us; we took a ride, and we drove up the Washougal River, and when we were well up the river we passed a place

that had a big sign up 'For Sale,' and she said, 'We are thinking, Cassie, of getting you a place,' and I had not heard anything about it, and she said, 'Let's go out and look at it,' and I didn't want to look at it, and we drove on. And they said they wanted to get us a place, and they said they thought the one we were on was too much of a burden to us, and that she wanted to do something for Oscar and I before they went back, and she asked me if I would be satisfied with a cheaper place, and I told her how much I liked the one where we were, and how well we were doing, and I did not feel discouraged at all; and she mentioned my father, saying that he did not like it, and that he would rather we would come back nearer Portland; that it would be more pleasant for all the family, and I still insisted about how much I like it where we were, and she said, 'That is so expensive,' and that they could not think of getting that place, but if we would be satisfied with a cheaper place they would help us, and that they would get a place for us, for me particularly; and we talked along in the same strain until we neared our way home, and she said, 'If we will get you a place, you might as well move; if we can find you a place, you will move?' and I said then, if it is going to be a real help, and my place, I suppose I would be foolish to stay on the place where I was and carry the debt when I could be free from debt. I don't remember any other conversation at that time, because we came up to the gate at that time.''

Oscar Thayer's testimony as to the original agreement is as follows:

"Q. Just state how you happened to move on and take possession of that property?

"A. I was living at Washougal, and my brother and his wife came up there to visit.

"Q. Who is your brother?

"A. Walton Thayer.

"Q. And his wife's name?

"A. Emily M. Thayer. And they were there a couple of days. The first day they were there Walton got to talking to me about family affairs, and he told

me that he and his wife had come to the coast to settle up the estate, mother's estate, and we talked the family affairs over. He wanted to know if I knew what money mother had let Walker have, and I told him what I knew, and he told me at that time that he owed the estate $800, and that as long as Walker and my sister had not said anything about settling the estate, and they had this money loose, and if I could find a place for that amount of money, he would buy it for me. Under those conditions he wanted me to look out for a place, and commence immediately to look out for one, and' he made several trips around to different places, and I made several, and we finally decided. * * Before he went east he didn't find anything that suited him, nor that suited me, and he told me to keep on looking. And he went east and I went up into a real estate agent's that I was in consultation with, and he told me about this Ridgeway place, and that he spoke to me about it, and he intended to go and look at it himself, but he was called east suddenly and he did not have an opportunity to look at it, but he told me to go up and look at it, and I went up and looked at it and made several trips up there. I thought that was the best I could do for the amount of money. He told me the amount of money he was to put into the place, and he said $1,100 or $1,200, and he said if I could find a place for that, he would buy it for us."

Emily M. Thayer testified, in substance, that she is the owner of the premises in controversy, and has owned them 13 years; that she visited Oscar and Cassie Thayer at Washougal and found them desperate because they could not meet their obligations, representing to defendants that if plaintiffs had the time and opportunity given them, without pressure, they might in time make good; that they believed an investment in Oregon would be good; that defendants were glad to make a safe investment, and at the same time help them; that they remained at Washougal two days, during which time defendant Emily M. Thayer went riding with Cassie, but that no conversation was had

with her about making her a present of a ranch, nor with Oscar; that she never dreamed of it, nor did she know anything about the lottery business or any debt from Walton to Oscar until last January, when Oscar mentioned it in a letter; that she was in Chicago when the Gaston ranch was purchased through Miss Colburn, the money paid for the ranch being inherited from her father, and received deed to the ranch in compliance with instructions; that she and her husband have never parted with the title thereto, and have never agreed to give the property to anyone, Oscar being given possession of the premises on condition that he and Cassie were to occupy the ranch and do the best they could with it, and pay defendants 6 per cent interest on the investment; that said interest was not called rent, and the taxes and insurance were to be paid by Oscar; that she requested payment of the interest four or five times, and remembers particularly one time when Oscar reported the birth of the child Catherine, and stated it was not convenient to make payment, for which reason she let the matter rest; that she did not keep any letters; that Oscar requested permission to sell part of the ranch in 1908 or 1909, the reply to which is not among exhibits, but that she never had any communication with Cassie concerning the place, and did not know they were claiming adversely; that defendants' financial affairs were in distress about the time of the purchase of the ranch, and that they were not in a position to make gifts, but tried to invest very carefully.

Walton Thayer testified, in substance, as follows: That he is the husband of appellant, Emily M. Thayer, and drew $15,000 in a lottery in 1887, the money being drawn in the name of Oscar Thayer; that he gave his mother $3,000 and Oscar $1,000, but did not agree to pay Oscar a year's interest on $12,000 at 6 per cent, or any sum in addition; that he was a member of the

firm of Thayer & Walker, which had made voluntary
assignment; that he did not draw the money in his own
name because he wanted to go east and did not want
to be detained; that the assets of the firm were good,
and it looked as though creditors would lose nothing;
that he visited Oscar Thayer at Washougal in June,
1898, with his wife, and found them in poor circum-
stances, Oscar stating that they could not meet their
obligations, and suggesting that if they could get on a
place where they would not be harassed for a year or
two they might get on their feet; that he told Oscar
his wife had some money left her by her father, and
that she had talked about investing in a ranch, and that
he would talk to her and see what he could do, but that
he did not promise Oscar that he or his wife would buy
a ranch for him in payment of the lottery transaction
or money due his mother's estate, and never promised
to get a ranch for Cassie, or to get his wife to do so;
that his mother's estate had not been administered,
and that the agreement regarding the ranch was that
Oscar and Cassie should go into possession of what-
ever place might be purchased, occupy it, pay the taxes,
insurance and nominal rent amounting to 6 per cent
on the purchase price, but that nothing was said as
to when or how the interest was to be paid.

Mary A. Thayer, a relative by marriage of Oscar
and Walton Thayer, testifies:

That she has known the parties for 23 years, and
talked with Cassie about the purchase of property
about the time Cassie left Washougal; that she told
Cassie she was glad to know she was buying a place
for herself, and that Cassie replied, "Molly, it is not
mine; it is Emily's."

Plaintiffs introduced a letter written by Walton
Thayer, dated at Portland, June 6, 1898, the material
portions of which are as follows:

69 Or.—10

"Toots and Sis sent you up a box Thursday which I presume you need all O. K. I inclosed a note giving data concerning two farms in your locality. I also inclose in this another memo. of a farm within 10 miles of your place. You will have to manage to look at any places we may hear of in your vicinity while I will do the outside skirmishing, and if we hit on a suitable place we can both go, would also want Cassie to see it before any change is made. I examined a farm about 7 miles back of Vancouver yesterday; it was an all-day job and I walked over almost every foot of a 50-acre farm. The place is not bad for the price ($1,200), but I am sure we can find something better for the same money. Had a good house and barn on it. Monday I am going to ride my wheel out to Gresham (12 miles out) to look at a 40-acre piece which I understand is fine. Dunn seems to think that Gaston place will fill the bill exactly, and we can get it for $1,100 or $1,200. I will try to get out there Tuesday or Wednesday and will let you know what I think of the Gaston and Gresham places. You can let me know what you think of the places you investigate and I should think within a month we might find something which would be an improvement on what you have as far as being comfortable as well as making a little money is concerned."

Plaintiffs also introduced in evidence a letter from Walton Thayer to Oscar Thayer, dated Chicago, August 3d, concerning the proposed purchase of a place for which Oscar was negotiating, in which occurs the following language:

"You did not say anything about the place. Please let me know what kind of a place it is and if Cassie is satisfied with it have her send Toots [referring to Emily M. Thayer] a line regarding it. Now Oscar we don't want any afterclaps about this thing if it goes through, and I trust you will appreciate this lift and do your best from this on. We don't want any farms in Oregon, and if it was not for giving you some assistance would not think of putting one cent into any farming land in Oregon or any other place. Sixteen

hundred dollars is more than we expected to put into any place and it is just at present going to inconvenience us to put up that much ready cash. I trust you will consider all these things. You can say to Durham we will furnish $1,600 and if he is not satisfied with your statement or telegram he can wire our bank here, and I guess they will notify him we are all right."

Another letter on the same subject, dated August 10, 1898, was introduced, being in part as follows:

"It would push us to put up $1,600 cash just at present, but as I wired you we would have made the struggle. We are willing to help you to getting a place. Everything is quiet here for Chicago."

The material parts of another such letter are as follows:

"Your letter was received several days ago. I also received a letter from Dunn some time ago, and he stated he had a place which just suited you and which you wanted, but he did not say it was the Gaston place. I am sure he is working you on the Gaston place, he certainly is when he says he wants $1,150 for it. He told me the place could be had for $1,000. The back taxes, interest and mtg. in all amounting to about $900; he also said the old man Ridgeway (I think that was his name) did not expect to make anything out of it. This being the case $1,000 would clean it all up. Now if you think you can take that place and make a go of it without further keep, we will furnish you the $1,000. We are not as flush with money as we were some weeks ago, having paid out $310 life insurance, $188 taxes, besides numerous other drains on our purse."

Plaintiffs also introduced a letter from Mrs. Emily M. Thayer to Miss Kate Colburn in relation to finally closing the deal for the Ridgeway place, which reads as follows:

"Dear Miss Kate: Oscar writes us that he has decided upon a farm known as the Ridgeway place near Gaston, Oregon. If Cassie too is satisfied that this is the best place for their purpose that the same amount

of money can purchase I am willing to buy the place for them in the hopes that they can some day own it themselves. Will you get Cassie's opinion of the place, as I respect her judgment, and if it is favorable will you consult with Oscar and your father regarding the details of the transfer. There is a mortgage on the place, also back taxes and interest to be cleared. If an absolutely clear title can be secured and all claims against the place of every description can be cleared for the amount of indorsed check $1,100 as Oscar writes us it can, please get the transfer and have the deed made out to Emily M. Thayer of Chicago, and give Oscar immediate possession of the place where I hope he can be more comfortable and meet with success. I will be very grateful to you and your father if you will give this your attention, as we have no personal knowledge of the deal and Oscar may not have the time or opportunity to make the desired investigation as carefully as it should be. Should this move not seem desirable in your judgment, please let me hear from you, as we make this purchase entirely for the benefit of Oscar and Cassie, and am anxious to avoid a mistake.''

Also, a letter from Walton Thayer to Miss Colburn, dated October 5, 1898, was received in evidence, the portion thereof material to this suit being:

''Your letter and papers to hand. Toots [meaning his wife] has been in the Chicago hospital for three weeks past having three operations performed. * * I hope Oscar will do well with the new place; at any rate he has a home which he can virtually call his own.''

The papers referred to in the letter were evidently the deed and other papers relating to the final transfer of the Ridgeway place to Emily M. Thayer.

In another letter of September 15, 1898, referring to the check sent to Miss Colburn to pay for the Ridgeway place, occurs this language:

''We decided to send check to Mr. Colburn because two or three heads are always better than one. We

want Cassie to be satisfied as well as yourself and it is our desire to have all of the Colburns satisfied as they are especially interested on Cassie's account and I don't blame them. Now, my boy I will say this: Take the place if it suits, do the best you can and show yourself a business man on a small scale and I will promise you that you will have all the help we can give you. It may not be much and it may not be any, as it depends altogether on how Toots' securities turn out. We discovered while in Jamestown, N. D., that $10,000 invested in a corporation there is almost practically worthless. Let us hear from you. Send us your P. O. address as soon as you move, if you decide to do so. And above all things my boy prove to Toots that you are a business man and I will promise you that you will get along all right and we will help you all we can. If Toots wants 6 per cent interest on the money pay it when it is due and it won't be long before you will own the farm.''

4. In our opinion the testimony in this case does not show an agreement on the part of Emily M. Thayer to make a gift of the land in question to plaintiffs, or to either of them. The suit in its last analysis is to compel specific performance of an oral agreement to convey land, and the value of the evidence offered must be tested by the well-established standards applicable to that class of cases. It may be premised that there is not a particle of evidence that Emily Thayer, at the time of the purchase of this land, or during any period anterior thereto, had any knowledge of the alleged fact that her husband owed any money to his mother's estate, or that she ever had the slightest intimation that he owed any obligation to his brother Oscar. Indeed, from his generous treatment of Oscar at the time he drew his money in the lottery, it appears very improbable that he owed him a dollar, either legally or morally. If he did, his wife appears to have been entirely ignorant of the fact, and it is clear that whatever promises or offers she may have made plaintiffs

were not made with a view to paying a debt of her husband to Oscar or his family, but on her own account; and, if she is to be compelled to convey this land to plaintiffs, it must be on the theory of compelling the performance of a parol promise to execute a gift of land, and not otherwise. That this can be done where possession has been taken and valuable improvements made is fully established in *Barrett* v. *Schleich,* 37 Or. 613 (61 Pac. 792) but as a preliminary the promise must be clearly and unmistakably made out: Pomeroy, Specific Performance (2 ed.), § 131; *Wagonblast* v. *Whitney,* 12 Or. 83 (6 Pac. 399); *Emmel* v. *Hayes,* 102 Mo. 186 (14 S. W. 209, 22 Am. St. Rep, 769, 11 L. R. A. 323); *Johnston* v. *Johnston,* 19 Iowa, 74; *Truman* v. *Truman,* 79 Iowa, 506 (44 N. W. 721); *Wilson* v. *Wilson,* 99 Iowa, 688 (68 N. W. 910); *Polk* v. *Clark,* 92 Md. 372 (48 Atl. 67). In our judgment no such clear and satisfactory evidence has been adduced in the case at bar. The testimony of Cassie Thayer is flatly contradicted by that of Emily M. Thayer, who says she never promised to make a gift of the land in question, and never dreamed of doing so. It is also contradicted by the testimony of Mary Thayer, who testifies that Cassie Thayer said to her, speaking of the farm, "Mollie, it is not mine; it is Emily's." The testimony of Oscar Thayer in this regard is contradicted by Walton Thayer, so that, so far as oral testimony goes, the preponderance of the evidence is with the defendants. The only writing signed by Emily Thayer is the letter to Miss Kate Colburn, dated September 15, 1898, in which she says that she is buying the place entirely for the benefit of Oscar and Cassie, and this excerpt, taken alone, might lend some color to plaintiffs' contention; but this construction is negatived by a direction to have the deed made out in the name of Emily M. Thayer, and by this significant language: "If Cassie too is satisfied that this is the best place for their purpose that the same amount

of money can purchase, I am willing to buy the place for them in the hopes that they can some day own it themselves.'' This language is not that of a person intending to make a gift of land to another. If a gift were intended, the obvious thing to have done was to have the deed made to the contemplated donee. If the intention was that Oscar and Cassie should be the owners, why express the hope that they might some day become the owners? The language is entirely consistent with the theory that Emily was purchasing the land for occupation by her husband's relatives, with a view of furnishing them a present home and means of making a living, and with the hope that they would finally be enabled to make enough upon it to pay for it and own it themselves. The letters of Walton Thayer are also consistent with this view, and absolutely inconsistent with the theory of plaintiffs. Thus, in his letter of August 3, 1898, he says:

''We don't want any farms in Oregon, and if it was not for giving you some assistance would not think of putting one cent into any farming land in Oregon, or anywhere else. · * * I trust you will consider these things.''

This is not the language of a man buying a farm to give away, but of one making a purchase for himself, and incidentally to assist his brother and family. Again, in his letter to Miss Colburn, dated October 5, 1898, appears the following language:

''I hope Oscar will do well with the new place, at any rate he has a home which he can virtually call his own.''

And, no doubt, if Oscar had been able to repay, in the dozen years he occupied the place, the advances so generously made him by his sister in law, she would promptly have conveyed the land to him. Again, Walton writes Oscar: ''If Toots wants 6 per cent on the money, pay it when it is due, and it won't be long until you own the place.'' It is evident that Walton

wished his brother to have the place, and probably would have been glad to have had his wife give it to him; but he was the impecunious husband of a thrifty wife, and it would have been an indelicate and probably fruitless act for him to have requested her to make his brother a present of the property outright, so in a confidential and brotherly manner he pointed out the way in which his brother could secure the regard of Emily, namely, by paying interest on the money she had invested in the land. It will be noted that this letter was written nearly two weeks before the purchase was made, so that plaintiffs were fully advised by its terms: (1) That they were not then to own the place when purchased; and (2) that their possible ownership in the future would depend upon their paying the interest on the money which Mrs. Emily M. Thayer was investing in it. They also knew that the deed was to be made to Emily, and not to them, and they cannot be heard to say that they were deceived or misled into moving upon the place and making improvements. Their original possession being permissive, they cannot now claim title by adverse possession. The evidence before us not only fails to establish the contention of plaintiffs; but, in our judgment, wholly negatives the claim that there was ever any contract or agreement on the part of Emily Thayer to purchase or hold the land in trust for plaintiffs, or to convey it to them by gift or otherwise.

The decree of the Circuit Court will therefore be reversed, and a decree entered here to the effect that plaintiffs have no interest or estate in the land in dispute, that defendants are the owners in fee, and entitled to the possession thereof, and that they recover their costs in this court.

REVERSED: DECREE RENDERED.

MR. JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE RAMSEY concur.