ELIZABETH HAGERTY et al., Appellants, v. DANIEL HAGERTY, Appellee.

GIFTS: How Effected—Oral Gift of Land—Delivery with Intent to
1 Pass Title at Present Time. Proof of delivery of possession and the holding of possession for any length of time after delivery does not, *in and of itself*, establish a gift. There must be shown an *intent* and *purpose* on the part of the giver to make a present gift and to pass the title to the donee upon delivery of possession, followed by such delivery in pursuance of that purpose and intent.

GIFTS: Evidence—Burden of Proof—Essential Elements—Clear, Sat-
2 isfactory, and Conclusive Showing. The burden of proof to establish an oral gift of land is on the donee, to prove by clear, satisfactory, and conclusive showing all the elements essential to a consummated gift.

GIFTS: How Effected—Evidence—Nature of Proof. The elements
3 sufficient to a gift may be shown by facts and circumstances, as well as by direct testimony.

WORDS AND PHRASES: ''Intent.'' "Intent" is an act or emo-
4 tion of the mind, seldom, if ever, capable of direct or positive proof, but is arrived at by such just and reasonable deductions from the acts and facts proven as the guarded judgment of a reasonably prudent and cautious man would ordinarily draw therefrom.

GIFTS: How Effected—Sufficiency of Evidence—Oral Gifts—Occu-
5 pancy and Improvements by Donee. Where one delivered the possession of land to his son, with the express purpose of passing the title to him, by gift, and the son took possession of the property in reliance upon that express purpose, and made suitable improvements upon the land in reliance thereon, occupying it until his death under that supposition, the title passed to him, even though there was no conveyance in writing; and upon his death, his heirs can quiet title against the donor.

WITNESSES: Competency—Transaction with Deceased—Oral Gift
6 of Land. In an action by the heirs of the donee to establish an oral gift of land by a father to a son, the father, under Section 4604, Code, 1897, is prohibited from testifying concern-
VOL. 186 IA.—84.

ing a contract made by him with the son at the time the son took possession of the land.

GIFTS: Review—Sufficiency of Evidence—Oral Gift of Land. Evi-
7   dence reviewed; and *held* that an oral gift of land had been made by a father to his son, and that the finding of the court to the contrary was not supported by the evidence.

*Appeal from Adair District Court.*—W. H. FAHEY, Judge.

MAY 19, 1919.

REHEARING DENIED SEPTEMBER 20, 1919.

ACTION to quiet title. Opinion states the facts. Decree dismissing plaintiffs' petition. Plaintiffs appeal.—*Re-. versed.*

*George B. Lynch* and *Carl P. Knox,* for appellants.

*P. L. Sever* and *John Connolly, Jr.,* for appellee.

GAYNOR, J.—This action is brought to quiet title to a certain 160 acres of land. The defendant filed a cross-petition, asking that the title be quieted in him. The plaintiffs are the wife and son of the defendant's youngest boy, J. S. Hagerty. The defendant is the owner of the record title to the land. He purchased it in 1905 or 1906, and took title in his own name, and it has so remained ever since. On March 17, 1906, with the knowledge and consent and at the request of the defendant, J. S. Hagerty, with his family (these plaintiffs), took possession of this farm. and continued to occupy it as a home until December, 1914, and during that time made valuable improvements upon the farm, paid all taxes, and paid the interest accruing upon a certain mortgage that was then upon the farm, and was never called upon by the defendant to account for any of the rents or profits accruing therefrom. In December, 1914, on account of ill health, J. S. rented this farm in his own name, and took the rent notes payable to himself, with

the knowledge and consent of defendant, and then moved with his family to the town of Stuart. He lived in the town of Stuart until his death, which occurred on the 23d day of May, 1916. During all the time he lived in Stuart, he collected and used all the rents from the farm, with the knowledge and consent of this defendant, and paid the taxes and the interest on the mortgage out of his own funds, during all the time he was in possession, whether in person or by tenants. The rent notes unpaid at the time of his death passed into the hands of his administrator, and were listed among his assets. On the death of J. S., defendant refused to make a deed of the land to his successors, the plaintiffs in this suit; and so this action was brought.

The contention of the plaintiffs is:

(1) That the defendant bought the farm for his son, and made an oral gift of it to J. S. in 1906, and, in consummation of the gift, delivered to him the possession; so that the title, through the gift thus executed, passed instanter to J. S., and was in him at the time of his death.

(2) That, if the gift should be considered imperfect, then, as J. S. took possession of the land in 1906, in reliance upon a *claimed* oral gift, and remained in the open possession of the same, with the knowledge of the defendant, ever since, under claim of right based upon the alleged gift, and has made valuable improvements, paid the taxes and interest on the loan then on the land, in good faith believing that the delivery of possession was in execution of a gift, the title was in J. S. at the time of his death, by adverse possession.

The defendant's contention, however, is that he did not make a gift of the land to J. S.; that J. S. did not take possession relying upon a gift of the land; that it was the understanding, when he took possession, that he should have only the right to use the land, free of rent, on

condition that he pay the taxes and interest on the mort-
gage.

Under these issues, the cause was tried to the court,
and a decree rendered for the defendant, dismissing plain-
tiffs' petition. From this decree, the plaintiffs appeal.

It is apparent that the case presents simply fact ques-
tions, with the burden of proof upon the plaintiffs.

It is conceded that the defendant purchased the prop-
erty and took the title in his own name, and that the record
title has so remained ever since.

We will consider, first, plaintiffs' claim based on a
present parol gift, executed by delivery of the subject-mat-
ter of the gift. On this branch of the case, the question to
be determined is: Did the defendant have a
present intent to make a gift of the prop-
erty in question to his son at the time the
son took possession, and was the delivery
of the possession to the son made in pursu-
ance and in execution of that intent? Proof of delivery of
possession, and the holding of possession for any number
of years after delivery, do not, in and of themselves, estab-
lish the gift. To establish the gift, the evidence must show
an intent and purpose on the part of the giver to
pass the title to the donee upon delivery of posses-
sion, followed by delivery of possession in pursuance
of that purpose and intent. Proof of an intent
to give at some future time, or proof of expressed pur-
pose to give at some future time, is not sufficient, though
possession is delivered and held. There must be proof of
intent to make a present gift; that is, proof of a present
intent and purpose to pass the title to the other, followed
by an actual delivery of the thing which is the subject-mat-
ter of the gift. The delivery of possession is only the final

1. GIFTS: how ef-
fected: oral gift
of land: de-
livery with in-
tent to pass
title.

step in the execution and consummation of
2. GIFTS: evi- the gift. The burden of proof is on the
dence: burden
of proof: essen- plaintiff to prove all the elements essential
tial elements.
to a consummated gift, and testimony to es-
tablish a gift against the record title must be clear and sat-
isfactory, and, as sometimes said, conclusive. See *Tru-
man v. Truman*, 79 Iowa 506; *Wilson v. Wilson*, 99 Iowa
688. In this last case, it is said:

"The law is well settled  *  *  *  that the burden is
upon the plaintiff [the plaintiff was the claimant under
the gift] to establish the alleged gift; that 'the evidence of
the gift must be direct, positive, express, and unambiguous,'
and must show that the gift has been completely executed.
'It is, therefore, necessary to the validity of a gift that the
transaction be fully completed; that nothing essential re-
mains undone.' "

The same doctrine is announced in *Farlow v. Farlow*,
154 Iowa 647, 649, in which it is said:

"A gift, to be effectual, must be fully executed; and
the question of whether or not there has been a gift in a
given case is one of fact, in which the intention of the al-
leged donor in delivering the property is a very material
inquiry."

It follows that the surrender of possession, the giving
of the right to occupy, and the occupancy for any number of
years, do not establish a gift. The gift, the intention to
give, and the intention to pass title to the
3. GIFTS: how ef- donee must be proven, together with the
fected: evi-
dence: nature of actual delivery of the subject-matter of the
proof.
gift. This, however, may be shown by
facts and circumstances, as well as by direct testimony.
The delivery of possession is merely a consummation of the
gift, and is essential to a completed gift. Mere occupancy
of the land for any number of years, with the knowledge
and consent of the record owner, is not, in and of itself,

sufficient to establish a gift; for this is often true though there be no gift, and no intention to give to the occupant the title to the thing occupied.

"Intent is an act or emotion of the mind, seldom, if ever, capable of direct or positive proof, but is arrived at by such just and reasonable deductions from the acts and facts proven as the guarded judgment of 4. WORDS AND PHRASES: "Intent." a reasonably prudent and cautious man would ordinarily draw therefrom."

Turning to the evidence as we find it in the record, we note that the defendant was nearly 80 years of age at the time this suit was brought; that there were born to him four children, one daughter and three sons,— a daughter, Mary, born in 1871; a son, William, born in 1873; a son, Charles, born in 1875; and the son J. S., born in 1877. In 1880, he purchased a farm of 160 acres, near the town of Templeton, Carroll County, known as the Templeton farm. He immediately moved to and occupied this farm, with his wife and children, and later, while residing on this farm, he purchased 80 acres in the same county. Here the defendant lived and educated his family, and laid the foundation for his fortune. His daughter, Mary, was married in 1897, and immediately moved with her husband to Adair County. Her husband died in 1910, leaving her and her children 240 acres of land. In 1898, defendant bought another farm of 160 acres in Guthrie County, near Dexter. The defendant never assumed any control over this farm, but, immediately after the purchase, passed it into the possession of his son Charles, who has occupied and farmed the same ever since, and was in the possession and occupancy, with all the indicia of ownership, up to the time that J. S. died. In 1908, he sold the Templeton farms, consisting of 160 and 80 acres, and purchased a farm of about 240 acres in Adair County, a few miles south of Menlo. The title to one of the 80's so pur-

chased was taken in the name of his wife, who died in 1915. Here the defendant resided, with his wife and one unmarried child, William, until the year 1912, when he and his wife moved to the town of Stuart, leaving William, who had married, in the possession of this farm. During the winter of 1905, the defendant purchased the farm in question, known as the Kelley farm, and, on March 17, 1906, placed his youngest son, J. S., with his wife (one of the plaintiffs), immediately in possession of it, as hereinbefore stated. These children all continued to occupy this land, rendering no account to the father for the rents and profits, until the death of J. S. No deeds were made to any of this land to any of the children until after the death of J. S. Less than a month after the death of J. S., and on the 14th day of June, defendant executed warranty deeds to each of his children as follows: To Charlie, the Dexter farm of 160 acres, which had been occupied by him ever since its purchase; and to William, 80 acres of the Menlo farm. He also joined with Mary and Charlie in the execution of a quitclaim deed to William of the 80 owned by the mother in the Menlo tract, she having died in the meantime, thus giving William 160 acres of the Menlo farm. The defendant also executed to Mary a warranty deed to 80 acres of the Menlo farm, it appearing that she had already received 80 acres as her dower interest in her husband's estate, thus making her the owner of 160 acres.

It therefore appears that, within a month after the death of J. S., the defendant executed warranty deeds to each of the sons for 160 acres, conveying to each the record title to the land theretofore occupied by him, without a showing of any consideration passing to him therefor, and a warranty deed to Mary for 80 acres, so that she too would have 160 acres, without any consideration passing to him therefor. It appears that these deeds were executed in the office of one Carl P. Knox, who testified to the execution

of the deeds in his office substantially as above set forth. He testified that, soon after the death of J. S., Charlie and Mary came to his office and made arrangements, or requested him to draw certain deeds. They gave him the description of the lands, or indicated what the farms were, and told him to whom the deeds were to be made. No one was present at that time except Mary and Charlie. Later, the others came to the office, and the deeds were executed. During Charlie's and Mary's first visit, he made a memorandum. He testifies:

"I drew four deeds: one deed from the defendant to his daughter, Mary, for 80 acres; one from the defendant to William, for 160 acres; one deed from the defendant to Charlie, for 80 acres; and on the next day, a quitclaim deed, which was signed by the defendant Charlie and his wife and Mary, to William, conveying to William their interest in the mother's 80, so that each of the children living would have 160 acres."

He testifies that Charlie made the arrangements and paid him for his services. Charlie said his father had never made a conveyance of his place to him, and he and Mary said they wanted the deeds drawn up; that the father was getting old; that William was to have the 160 acres of the Menlo farm; that something might happen, and they thought better to have deeds passing the record title. At the time the deeds were prepared, the scrivener remarked, "I suppose Steve owns the place south of Adair, does he?" and Mary spoke up and said, "No, Father is going to keep that for his support." During the time, the defendant, Hagerty, said nothing, but just signed and acknowledged all the four deeds. Charlie was the principal one to give instructions,—he and Mrs. James. Will and his wife did not have to sign any deeds, but Will was there during part of the time.

There is no explanation made in this record as to why

the defendant did not execute the deeds earlier. It is manifest on the record that each of these children considered himself entitled to a deed from his father whenever demanded. It appears that the father never hesitated in executing the deed, when requested. There is not the slightest doubt in this record that William and Charlie always considered themselves the owners of the land occupied by them, and entitled to have a conveyance of the record title by the father at any time upon demand. It appears that some ill feeling had grown up between the plaintiff, Mrs. J. S. Hagerty, and the members of the Hagerty family. We are inclined to think that the refusal to execute the deed to the farm occupied by J. S. was due, in a large measure, to this feeling. It appears that, when the scrivener said, "I suppose Steve has his deed," this defendant made no reply. His daughter spoke for him. There is no evidence that the father did not entertain the same affection for this son that he did for the other sons and the daughter. There is no reason even to suspect that he did not intend to make J. S. a conveyance of the record title under the same conditions and upon the same consideration that attended the execution of the deeds to these other children. It follows that, if he delivered possession of this farm to J. S., with the intention present in his mind to pass the title by gift to J. S., the withholding of the deed did not affect the passing of the title. When he delivered the possession to J. S., with the express purpose of passing the title to him by gift, and J. S. took possession of the property, in reliance upon that express purpose, and made valuable improvements upon the land in reliance thereon, and occupied it until his death under that supposition, the title passed to him, even though there was no conveyance in writing;

5. GIFTS: how effected: sufficiency of evidence: oral gifts: occupancy and improvements by donee.

and defendant cannot divest his heirs of the title by refusing to execute a deed.

So we turn back in the record to what was said and done by his father at the time, and just prior to the time, the farm was purchased, and at the time possession was surrendered to the husband and father of these plaintiffs.

The plaintiff Elizabeth Hagerty testified:

"While we were living in Dexter, J. S. was running a meat market. Mother Hagerty visited us, and asked us to be on the lookout for a farm, and said that, if we found one, it was to be ours. On this suggestion, we began to look for a farm. Found one farm that was satisfactory, but the purchase fell through. Charlie and Will aided us in looking up a farm. They finally bought the farm in question. When Will came back, he said, in the presence of Father Hagerty, 'We have got you a farm.' When we started down to take possession of the farm, Mother Hagerty said, in the presence of Father Hagerty, 'Now, Steve, you are going on this farm. Try to make good, and take care of yourself.' Father Hagerty said: 'You are going on the farm. Now improve it, and make good.' When my husband's health began to fail, both Father and Mother Hagerty came to our home, and Mother Hagerty said, in the presence of Father Hagerty, 'Why don't you rent the farm? You can live on the rent. The rent of the farm will keep you.' Father Hagerty said, 'You are not physically able to farm here any longer.' "

She further said, in substance, that, when the old folks and the boys were looking for a farm for her husband, defendant said that, when it was purchased, it was to be Steve's. We gather from the whole record that defendant purchased it for the son.

There is some rambling testimony touching statements made by J. S., touching the ownership of this farm. These can be accounted for and traced to the fact that the record

title still remained in the father. When taking insurance upon the buildings, though paying for the insurance himself, he had the policies taken out in his father's name, but under the advice of the soliciting agent that the insurance must be taken out in the name of the record owner. This same agent drew the lease when J. S. left the farm. The lease was drawn in the name of J. S., but he was then advised by this same party that the lease should be taken out in the name of the father. We consider this of no probative force. J. S. is dead, and his father's mouth is, or ought to be, closed to any personal transactions between him and his son. He has attempted to make some statements touching a contract made by him and his son at the time the son took possession. This is prohibited under Section 4604 of the Code, and the right to give this testimony was not opened to him by any testimony given by the plaintiff in her own behalf. We do not consider his testimony, therefore, in reaching the conclusion which we reach in this case; and that is that it was the intention of the father, when he passed the possession of this property to his son, J. S., to make him a gift; that the gift was consummated by delivery; and that the title passed through the consummated gift to J. S., and through him to these plaintiffs; further, that it is apparent from his conduct in dealing with the other sons, to whom he sustained no closer relationship, and for whom it is not shown he entertained any higher regard, that it was his purpose, during the life of J. S., to deal with him on the same terms on which he dealt with the other boys; that the other boys assumed and understood that the property occupied by them was a gift from the father; that all that remained for them was that the father, on request, should make a deed conveying the record title. There is not the slightest doubt in this record that they claimed the gift; that the gift was

6. WITNESSES: competency: transaction with deceased: oral gift of land.

consummated; and that the deed was not for the purpose of conveying title, but for the purpose of making perfect the record title. At the time the deeds were made, they assumed that they owned the property. All their speech indicates that assumption, and they said: "The old man is getting old; something may happen; and we better have these deeds to put of record,"—not to convey title, but to show of record the fact of title. The father made them on their solicitation; never made objection; never asked any consideration; but made them in fulfillment of a gift already consummated. He did it as a perfunctory duty, resting upon him by reason of a previously consummated gift. The sons did not ask that the father convey them some property, but that he make a deed to them of specific property; and the deeds were accordingly made. There is no evidence, as in one of the cases hereinbefore cited, that the father considered the making of the deeds essential to the passing of title. The first suggestion of deeds came from the children themselves, and they were then requested only to perfect the record title.

The title having passed by gift, it cannot be defeated by the contumacious refusal of the defendant to execute a deed; and the plaintiffs are entitled to have the title quieted in them. Further than that, if the gift

7. GIFTS: review: sufficiency of evidence: oral gift of land.

is not as fully proven as it might have been had death not intervened, yet we are satisfied that J. S. took possession under the honest belief that the father had made a present gift of the land to him, and occupied under claim of right based on the alleged gift. On no other theory can the expensive improvements placed upon the land by J. S. be accounted for. These improvements continued up to the very time of his death, and the rentals accruing on the land after his death were taken and disposed of as the assets of the estate of this dead son.

It would be unprofitable to set out all the evidence. Some of it is very unsatisfactory, and some very unreliable; but, taking the whole record, and all the facts and circumstances which the record discloses, we have reached the conclusion that the court erred in dismissing plaintiffs' petition, and that the decree should have been entered in favor of the plaintiffs, quieting title in them as against any claim of this defendant.   The cause is—*Reversed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.