MARION E. RUNNELS, Intervener, Appellant, v. G. E. ANDERSON et al., Appellees.

GIFTS: How Effected—Necessity of Delivery. To make a gift
1   effectual, the thing which is the subject-matter of the gift must
be delivered in execution of the gift, and there must be not
only intent and purpose to give and to pass title, but there must
be a delivery, in pursuance of that purpose and intent.

GIFTS: Requisites—Evidence—Burden of Proof. The burden of
2   proof is on one who asserts a gift to prove all the essential
elements to consummate the gift, and this evidence must be
clear, satisfactory, and conclusive.

GIFTS: Requisites—Evidence. Proof of gift must be independent of
3   the mere act of occupancy for any number of years, where one
relies upon a gift for his title, and it must be shown that the
possession was given and taken in pursuance of and in reli-
ance on the gift, with the knowledge and consent of the giver.

FRAUDS, STATUTE OF: Operation and Effect of Statute—Parol
4   Gift of Lands—Possession. There is not such possession as re-
quired under Secs. 4625 and 4626, Code, 1897, to prove a parol
gift of land, where the possession is taken under and by virtue
of the contract of gift, where, at the time of and before the
alleged gift was made, the donee had the same character of
possession as she had after that time.

ADVERSE POSSESSION: Nature and Requisites—Gift of Land.
5   Evidence reviewed, and held insufficient to establish a claim
of adverse possession under alleged gift of land.

*Appeal from Page District Court.*—E. B. WOODRUFF, Judge.

JULY 7, 1919.

REHEARING DENIED SEPTEMBER 20, 1919.

ACTION by a wife to establish her right to a distributive share in certain lands claimed to be the property of her husband at the time of his death. Answer by a daughter, denying the ownership of the property in the husband at the time of his death, and claiming ownership to the property under gift. The opinion states the facts.—*Reversed.*

*Tinley, Mitchell, Pryor & Ross,* for appellant.

*T. J. Hysham, Ralph Pringle,* and *R. W. Beeson,* for appellees.

GAYNOR, J.—This action was begun October 24, 1913, by B. F. Runnels, through his guardian, Marion E. Runnels, who was also his wife, to quiet title to a certain 400 acres of land, the record title of which stood in the name of B. F. Runnels. The original action was against Janie Anderson and her husband. The defendant Janie Anderson is the daughter of B. F. Runnels, and G. E. Anderson is her husband. On February 7, 1914, Janie appeared and denied the right of the father to have the title quieted in him, claiming that, on or about the 25th day of November, 1886, he gave the land to her; that she took possession under the gift, and has ever since retained possession; or, in other words, she claimed the land as her own, against any claim asserted by her father, on the ground that she was the absolute and unqualified owner of the same, through an oral gift from him. In this original action, Janie Anderson also filed a cross-petition against her father, asking that the title be quieted in her, on the ground of the alleged gift. The whole matter was standing thus upon the records when B. F. Runnels died, April 20, 1914. Thereafter, and on September 2, 1914, the wife, Marion, who commenced the suit for him as guardian, filed a cross-petition in her own

right, alleging that the land in controversy belonged to her husband at the time of his death; that she is his widow, and as such, is entitled to her distributive share, to wit, an undivided one third. Walter Runnels, a son, also filed a petition of intervention, claiming that he, as heir at law of B. F. Runnels, is entitled to an undivided one third. On September 5, 1914, Janie filed an answer to the aforesaid petition, and also a cross-petition, making the same claim as made by her against her father.

Upon these petitions, issue was joined, and the cause tried to the court. The court found against the widow, in favor of the defendant Janie Anderson, and found and decreed that she was the absolute and unqualified owner of the land in controversy, under gift from her father, made in 1886, and before any rights of this widow attached. The effect of this was to dismiss the cross-petition of Walter Runnels. Marion E. Runnels, the widow, alone appeals.

The only question presented here for our consideration is one of fact: Was the defendant Janie Anderson the absolute and unqualified owner of the land in controversy, under gift from her father, before any rights of Marion E. Runnels, wife of B. F. Runnels, attached to the land? The law that governs the rights of the parties has been fully settled by our prior holdings.

Before entering upon a consideration of the merits, it is well to have before us the situation and relationship of the parties during the time covered by this controversy.

It appears that B. F. Runnels was three times married. By his first marriage, he had three children: the defendant, Janie Anderson; a son Irving, who died without issue; and a son Walter, the intervener, who, we understand, is a mental incompetent, and is and has been under guardianship. So that, at the time of his death, he left surviving him his widow, Marion E. Runnels, a daughter, Janie Anderson, and this son, Walter. His first wife

died December 30, 1878. His second wife, who is known in this record as Alice (the date of this marriage does not appear), separated from B. F. in 1883, and died in January, 1887, without issue. He married the present wife, Marion E. Runnels, June 8, 1888, about 17 months after the death of his second wife, Alice, and a little more than 18 months after the alleged gift to the defendant daughter, Janie. B. F. Runnels, at the time of his death, was about 91 years old. His wife, Marion, was thirty years younger. It appears that B. F. Runnels was adjudged insane and sent to the insane asylum, some time in 1883. In April, 1883, a petition was filed by his daughter, Janie, alleging that he had been adjudged insane by the commissioners of insanity of Montgomery County, and that he had 400 acres of tillable land, about 90 head of stock cattle, about 60 head of hogs, and about 25 head of horses, besides other farm property, that needed care, and praying that a guardian of his property be appointed. The court appointed a guardian, as prayed, on the 30th day of April, 1883. It appears that Runnels was adjudged insane by the commissioners of insanity on the 24th day of April, 1883, and prior to the filing of the petition for the appointment of a guardian. He was released, and for several years seems to have been capable of attending to the ordinary affairs of life. He was under guardianship, however, at the time this suit was commenced. It appears that, at one time, he was a large owner of lands; that, in 1877, he conveyed, by warranty deed, about 280 acres of land to his son, Walter, and on October, 1881, about 740 acres; that he caused to be conveyed to Walter, on December 1, 1887, 80 acres, the consideration for which was paid by B. F., consisting, in all, of about 1,100 acres; that title to all this land passed to Walter without any consideration passing from him to B. F., his father. This land will be known hereafter as the Hawthorne farm.

It further appears that B. F., the father, *deeded* to Janie, his daughter, 440 acres of land immediately adjoining the land in controversy, and that, in the spring of 1884, Janie and her husband took possession of this deeded land. The deed was made in 1881, and was delivered to Janie soon after her marriage, which occurred December 25, 1883. The location of the deeded land and the land in controversy is shown by the following plat:

The land in controversy appears from the plat to be directly east of the deeded land, and adjoins it.

Taken concretely, the contention of Marion E. Runnels, the widow; is that there was never any completed gift of the land in controversy to this daughter, Janie, shown by this record. The only evidence of the oral gift relied upon is found in the testimony of her husband, who claims to have overheard a conversation between B. F. and Janie on the 25th day of November, 1886, in his home on the deeded land. To corroborate this, however, the uncertain testimony of several witnesses is in the record, tending to show statements made by B. F. to the effect that he had given this land to Janie. To the testimony of Janie's husband and these other witnesses, we will advert

later. For the present, we wish to say that the undisputed evidence shows that, in making gifts to his children, B. F. seems to have always considered it necessary to make written conveyances, and did make written conveyances. If this gift was made, as claimed by Janie, it certainly is an exception to his method of dealing with his children. When he conceived the idea of giving the 440 acres to Janie, lying immediately west of the land in controversy, he made a deed, which, though executed in 1881, was not delivered to her until 1883, and then only after her marriage. Janie and her husband did not take possession until the spring following. When he conceived the idea of conveying land to his dead son, Irving, he made a deed. This deed was dated April 3, 1877, about the same time he made the first conveyance to Walter. This deed conveyed to Irving the same property subsequently *deeded* to Janie. On account of Irving's death, the deed was never delivered, but was canceled. When he conceived the idea of making a gift of land to Walter, he made two deeds, and when he conceived the idea of transferring land from another to Walter, the consideration for which passed from B. F. to the grantor, a deed was made directly to Walter. He had, therefore, in his mind the need of written conveyances, under the statute, to convey a perfect title, and avoid the statute of frauds.

It will be noted that, at the time it is claimed this gift to Janie was made, B. F. was still married to his second wife, Alice, but was then living apart from her. It is urged that this is one reason why, at this particular time, no deed was executed by B. F. to Janie of the land in controversy. It is urged that it was his thought that he could not make a deed to her without the concurrence of his wife, Alice, and that her concurrence could not then be secured. This is urged as a reason why there was such a radical departure from his method in doing business with

his children in respect to this particular land, and at this particular time. In fact, Anderson testifies that the reason assigned by B. F. for not giving a deed, at the time it is claimed the gift was made, was that his wife would not join in the deed. It appears, however, that the wife, Alice, who stood in the way of the execution of the deed, died about a month after the alleged gift. He was then free to make the deed. Not until 18 months after the alleged gift did he remarry. It does not appear that any request was made for a deed, after the alleged impediment was removed. He executed no deed during that interval when he was free to do so. The impediment standing in the way of the execution of the deed having been removed so shortly after his declaration of his purpose to deed the land, except for the impediment, it would seem that, if a gift were in fact intended, it would be reasonable to expect that he would execute it as soon as the impediment was removed. We say this because, even in this conversation, he recognized the necessity for having a properly executed deed, and refused to execute any written evidence of the alleged gift, basing his refusal upon the fact that his wife, Alice, would not join in the deed.

Assuming, for the purpose of argument, that a conversation occurred between B. F. and his daughter, Janie, on the 25th day of November, 1886, substantially as testified to by her husband, G. E. Anderson, to which we will refer more in detail hereafter, yet it does appear that, in that conversation, he said to his daughter that he could not deed the land to her because his wife, Alice, would not join in the deed. Assuming, for the purpose of argument, that he had it in his mind, then, to make a gift of this land at some time to Janie, it does appear from that testimony that he at least thought there was an impediment in the way of his doing so. Anderson testifies:

"In their talk [referring to the talk in their home on

the 25th day of November], he referred to making a deed at that time to Mrs. Anderson, but he said Alice [meaning his wife] would not join in the deed,"—thus again emphasizing the fact that, in the mind of B. F., a deed was essential to a consummated gift.

This brings us to the only testimony tending directly to establish the oral gift relied upon, and it is substantially this: Referring to the 25th day of November, 1886, and the conversation alleged to have taken place there between B. F. and his daughter, Janie, G. E. Anderson said:

"Well, Mrs. Anderson and her father were talking about the settlement he had made with Mrs. Runnels [that is, his wife Alice]. They discussed that some, and they talked about what he had given to Walter, and ended up with what he gave her."

The question was then asked:

"State what he said and what she said. A. Well, he said that 'I give you this land here, which is not as much as I have given Walter. It will be all right in the end.' He said, 'Of course, you will have to take care of the mortgages that are on it.'"

He was then asked:

"Well, go on and state what else they said about it. A. Well, I don't remember anything particularly more. I think they drifted on from that to something else. Q. I want to know if anything else was said by either of the parties in regard to the land in controversy, or the mortgages. A. I don't remember anything, only a general conversation in regard to the mortgages; that she was to take care of the mortgages, whatever there was on the land. That is my understanding, as near as I can remember. Q. Well, what did he say? I don't want your understanding. State what he said. A. Well, he just—that was the windup of the conversation. I think he spoke about what he had given Walter, and what he—the way it came up, I think,

was the settlement he made with his wife, Alice, and he just made a separate settlement with her shortly before that, or not very long before that; and he was just virtually stating what he had given Walter and what he was giving my wife, so as to have it understood he was dividing the land. Q. Without reference to Walter, now,—to what he said about giving Walter,—I want to know what he said to Mrs. Anderson, if anything, about the land in controversy? A. Well, he said he was giving her all of the land there. That included the land in controversy, as I understood it. Q. State what he said, if anything, in regard to the number of acres. A. Well, I don't remember whether they stated the exact number of acres or not, but there was 840 acres there, altogether. Q. I want to know what he said to Mrs. Anderson. A. Well, I can't say for sure that he specified any particular land, only all that was there. Q. What did Mrs. Anderson say, if anything? A. 'All right, Father, whatever you say is all right.' Q. Now, after that conversation, who took possession of the land in controversy, if you know? A. Well, Mrs. Anderson and myself had always had possession of it up to that time. Took possession of it. Q. By what authority or reason have you been in possession, if you know? A. Looking after it for my wife."

He further testified, touching the land in controversy, that there were 250 acres of the land subject to overflow; that the land was fenced, but not ditched, drained, or tiled; that the ditching was done probably about 1885 or 1886; that the fences had been rebuilt since he had been there; that he thought he put a new fence nearly around it, in the spring of 1894. He further testified that, in the conversation between his wife and B. F., he took no part; that, in the talk, B. F. referred to making a deed at the time to Mrs. Anderson, but said his wife, Alice, would not join in the deed.

The record discloses that all the valuable improvements placed on any of the land occupied by Janie and her husband were placed on the deeded land. Valuable improvements were placed upon the deeded land, but none upon the land that is claimed to be the subject of the gift. It was used by the Andersons, before the alleged gift, practically the same as it was used after the alleged gift. There was no visible surrender of any rights on the part of B. F. over this claimed land that did not appear before the alleged gift, and there was no visible evidence of anything done by the Andersons, after the alleged gift, that indicated in the least that they deemed themselves to be sustaining a different attitude towards this gift land, after the alleged gift, than they sustained before.

Our statute of frauds, Section 4625 of the Code, provides:

"Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent:   *   *   *   4. Those for the creation or transfer of any interest in lands, except leases for a term not exceeding one year."

The exception to this is found in Code Section 4626, and this exception is that the fourth division will not apply "where the purchase money, or any portion thereof, has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, *has taken and held possession thereof under and by virtue of the contract.*"

There is no pretense that Janie paid her father any consideration for the land in controversy, or, in fact, for the other land, deeded to her in 1883. She does not claim to have purchased. She bases her right up-

1. GIFTS: how effected: necessity of delivery.

on gift. To make a gift effectual, the thing which is the subject-matter of the gift must be delivered to the donee in execution of the

gift. Or, in other words, the gift must be consummated by the delivery of the subject-matter of the gift, in pursuance of the gift; that is, in execution of the intended purpose to give. There must be not only intent and purpose to give, and by the gift to pass title to the donee, but there must be a delivery, in pursuance of that purpose and intent. Or, in other words, there must be proof of intent to make a present gift, with the present intent and purpose to pass title, followed by an actual delivery of the thing which is the subject-matter of the gift. The bur-

2. Gifts: requisites: evidence. burden of proof. den of proof is on the one who asserts the gift to prove all the essential elements to consummate the gift, and this evidence must be clear and satisfactory, and, as some of the cases say, "conclusive." *Truman v. Truman,* 79 Iowa 506; *Wilson v. Wilson,* 99 Iowa 688. In this case it is said:

" 'The evidence of the gift must be direct, positive, express, and unambiguous,' and must show that the gift has been completely executed. 'It is, therefore, necessary to the validity of a gift that the transaction be fully completed.' "

The same doctrine is announced in many subsequent cases.

Mere occupancy does not prove the gift. The surrender of possession and the taking of possession are essential elements in the consummation of a gift, but they do not prove the gift. Occupancy for any num-

3. Gifts: requisites: evidence. ber of years does not, in and of itself, prove the gift. True, the fact of the gift may be shown by facts and circumstances, as well as by direct testimony. It must be shown, however, that the possession was given and taken in pursuance of and in reliance on the gift, with the knowledge and consent of the giver. The occupancy may be permissive only; may be that of tenant; may be only a gift of the use. The taking possession and the occupancy must be traceable to a right found in the

gift, before it adds anything to a right based upon the gift. Or, in other words, the proof of gift must be independent of the mere act of occupancy for any number of years, where one relies upon a gift for title.

It will be noticed from an examination of the statute of frauds, in so far as it governs the transfer of real estate, that no evidence of the creation or transfer of any interests in lands, except leases for one year, is competent, unless it be in writing and signed by the party charged. It will be noted that to this there are exceptions, and that these exceptions relieve from the obligation of the statute that the transfer be evidenced by writing, in two cases: (1) When the purchase money, or any part thereof, has been received by the vendor. (It is not claimed that any was received here.) (2) When the vendee, with the actual or implied consent of the vendor, has taken and held possession under and by virtue of the contract which created the interest, or transferred the title. The elements essential to create or transfer any interest in this land from B. F. to Janie are wanting in this case. It is conceded that there was no instrument in writing ever made, conveying the land, no consideration paid, and possession was not taken under and by virtue of the contract of gift. At the time and before the alleged gift was made, the Andersons had the same character of possession that they had after that time.

4. FRAUDS, STATUTE OF: operation and effect of statute: parol gift of lands: possession.

Up to this point, the evidence in this case is not such as the law requires to establish a gift. It is not clear, not satisfactory, and certainly not conclusive. The evidence of the gift is not direct, positive, express, and unambiguous. It does not show an executed gift. We may gather from this that B. F. had in his mind, when the impediment was removed, to make a deed to Janie of the land in controversy. The conversation overheard by Anderson does not

convey to our minds the thought that B. F. had in his mind, at that time, a purpose to part with the title to the land in controversy to his daughter, Janie. He expressly said that he could not make a deed, because of the impediment then in the way. By deeds, not words, all prior gifts had been made. We may gather from Anderson's testimony that B. F. lamented the impediment in the way of consummating the gift. This is certain. No change occurred in the attitude of the Andersons toward this land after the alleged gift that indicated in the least degree that they considered their relationship to the land changed thereafter. Nothing was done by them that is not just as consistent with the permissive right to continue to enjoy the use as it is with the gift of the fee.

It must be borne in mind that, at this time, as revealed by Anderson's testimony, the old gentleman was discussing his settlement with his wife, Alice. He was reminiscencing over the gifts he had made to his children. He was then in the home of his daughter, on the land deeded by him to her. He was then only 63 years of age, with some considerable expectancy left in life. The record discloses that this 400 acres involved in this suit was practically all his land possessions, of any value, at that time. Not long after the death of his wife, Alice, in January, 1887, he is shown to have been casting about for another mate. He may have had in his mind a purpose, at the time the conversation was overheard by Anderson, to some time deed to Janie this additional 400 acres. Within a month thereafter, the death of Alice left him free to do so, and also left him free to roam in search of another soul mate. B. F. was an infidel. He saw an advertisement for a soul mate in an infidel paper. Here, thought he, is a soul mate for me. He responded to the advertisement, and the soul mate is now his widow. If the daughter should prevail in her controversy, this widow would be left, after 28 years of

service, penniless, so far as the estate of her soul mate is concerned.

We turn now to the evidence offered by the Andersons in corroboration of the alleged gift. This is found in the testimony of neighbors, who claim to have had conversations with B. F. some 20 or 28 years before, touching the gifts that he had made to his children. It would serve no good purpose to set out this evidence. When viewed in the light of the fact that, at the time these conversations were had, he had already deeded to Walter 1,100 acres, and had deeded to Janie 440 acres, the testimony has but little value. The conversations testified to, touching his gifts to his children, seem to be so irrelevant to the subject-matter that called them together, so irrelevant to anything in common between them, that we marvel at the apparent accuracy with which they remember the facts. One testified that, some time after the death of the second wife, Alice, the date of which he does not remember, Runnels spoke to him about his lands; told him his troubles and dislikes; spoke about giving the land down there to Janie; talked about giving the land at Hawthorne to Walter. He testifies that he doesn't remember how much land there was in the Hawthorne farm; but, after the thumbscrew process of repeated questions, slightly suggestive, he says he thinks he remembers that there were 900 acres in the land given to Janie.

The same is true of another witness, who testifies that he has lived in Nebraska for 20 years; that he never thought of any conversation he had had with Runnels during that time; that, one time, he went to see Runnels about purchasing cattle,—asked him if he wanted to buy some cattle; that Runnels was then living on the Hawthorne farm, owned by Walter; that Runnels said he didn't want to buy any stock,—didn't have any property there; further said, when asked why he didn't put some cattle down at

Clarinda (referring to the land in question and the other land deeded to Janie), that he had given the land down there to his daughter, and didn't have any more business down there. Then he proceeds to direct the conversation out into a discussion of the gifts to Walter and Janie, and is quite circumstantial about the matter, giving the conversations involving matters that were in no way concerned with the subject-matter of his visit.

Another witness testifies that he was a hotel keeper; that Runnels often visited his hotel; that he heard a conversation in which a discussion arose touching the giving away of property before death; that one of the parties remarked that he wanted his administrator to earn his salary; that Runnels said, "Give it away now;" that he had given his daughter 900 acres at Clarinda; that this conversation occurred in 1885 or 1886; that it was before the second wife, Alice, died; that Runnels was not talking to him; that he was talking to others. All the others are now dead.

This is a sample of the testimony that is offered to corroborate the claim of this plaintiff that B. F. gave her this land in controversy. Waiving any feeling of incredulity that might exist in the mind because of the long time intervening between the conversations and the testimony of these witnesses upon the stand, and waiving the irrelevancy of the statements claimed to be made by Runnels to any matters that might be of common interest between them, we have to say that the testimony is too uncertain, too vague, too indefinite, to be of any probative force upon the issue tendered here. There is no direct testimony, savoring of spontaneity, given by any of these witnesses, that he made special reference to this particular land. All the other land had been given, but deeds had been executed.

We hold, therefore, that the evidence does not establish a completed gift, or any transfer from B. F. to Janie that

takes it out .of the statute of frauds, or brings it within the
exceptions to the rule that the creation or transfer of any
interest in any land shall be in writing.

There is some claim made on the basis of adverse pos-
session; but there is nothing in this record that justifies
the holding that Mrs. Anderson ever claimed adversely to
her father.    There is no claim of right
5. ADVERSE POS-    shown under which she took possession, in
SESSION: nature
and requisites:    good faith believing that she was entitled
gift of land.
to it, and there is no showing of any color
of title upon which she can rest a claim.    It cannot be said
that she took possession in good faith, believing that the
gift had been made by her father, to her,—that she took
possession in reliance upon the gift made by her father to
her; because there is no evidence of this fact.

Upon the whole record, we think the court erred in its
decree, and the cause is, therefore, reversed, with a direc-
tion to the court to enter a decree giving to this widow,
Marion E. Runnels, her distributive share in the land, as
the property of her husband at the time of his decease.—
*Reversed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.