O. S. MYERS, Appellant, v. ALBERT MYERS et al., Appellees.

FRAUDS, STATUTE OF: Real Property—Oral Gift or Contract of Sale. An *oral* gift of land or an *oral* contract for the purchase of land can be established only by clear, unequivocal, and definite proof. Testimony held insufficient to show either a *completed* gift or a contract of purchase.

*Appeal from Dallas District Court.*—J. H. APPLEGATE, Judge.

MAY 6, 1924.

ACTION in equity, to set aside a mortgage. The plaintiff claimed to be the equitable owner of the land under a parol contract with his father, the mortgagor. From a decree dismissing his petition, plaintiff appeals.—*Affirmed.*

*E. W. Dingwell* and *White & Clarke,* for appellant.

*Burton Russell, Howard & Sayers, Graham & Osborn,* and *George J. Dugan,* for appellees.

VERMILION, J.—This action was brought by the plaintiff and appellant, O. S. Myers, against Albert Myers, his father, and the Farmers & Merchants Securities Company, to set aside a

mortgage given by the defendant Albert Myers to the Securities Company upon a tract of 120 acres of land in Dallas County, to secure his notes to the amount of $28,000, and to set aside a deed for the same land subsequently executed by him to the Securities Company. There are other parties, whose rights are not now involved, and other issues were presented in the court below that are not material on this appeal. The only question now presented is whether the appellant or Albert Myers was the owner of the land in controversy at the time the mortgage was executed. If the appellant was the owner of the equitable title, his possession gave notice of his right, and the mortgage executed by Albert Myers should be set aside. On the other hand, if he has failed to show such ownership, he is in no position to question the validity of the mortgage.

The claim of the plaintiff, as stated in the petition, is that his father, Albert Myers, verbally agreed to turn over and deliver to appellant the land in controversy, as his share in any estate his father might leave at his death, and that, upon his taking possession of such land, it should become the property of appellant; that the land was taken at a valuation of $160 per acre, in the settlement of the estate of the father; that, in case in the lifetime of the father it should become necessary, appellant would contribute to the support of the father such sum as might be demanded, not in excess of the fair rental value of the land.

It is undisputed that the appellant went into possession of the land and has so continued, and has made valuable improvements on it. The record title remained in the father until the conveyance by him to the Securities Company. The sole question is whether the appellant became the equitable owner of the land. This must be determined from the testimony of the appellant himself, the father, and other members of the family testifying on behalf of plaintiff, in connection with certain undisputed circumstances.

It was not entirely clear to the court below whether appellant claimed a sale or a gift of the land to him, and we confess to the same difficulty, after reading the testimony, but find ourselves in entire agreement with the conclusion there reached that he has failed to establish either.

It is well settled that, to establish either a parol gift or contract of conveyance of land, the one so claiming must establish the gift or contract by clear, unequivocal, and definite testimony, and that the acts claimed to be done thereunder should be equally clear and definite, and referable exclusively to the contract or gift. *Williamson v. Williamson,* 4 Iowa 279; *Truman v. Truman,* 79 Iowa 506; *Chew v. Holt,* 111 Iowa 362; *Briles v. Goodrich,* 116 Iowa 517; *Bevington v. Bevington,* 133 Iowa 351; *Ross v. Ross,* 148 Iowa 729; *Farlow v. Farlow,* 154 Iowa 647; *Runnels v. Anderson,* 186 Iowa 1370; *Lembke v. Lembke,* 194 Iowa 808. The burden of proof is upon a purchaser to establish his acceptance of an offer made to him. *Franklin v. Tuckerman,* 68 Iowa 572; *McDonald v. Basom,* 102 Iowa 419.

The father, Albert Myers, had two sons, the appellant and John, and three daughters. In about 1913, he undertook to make some arrangement for his sons. He deeded 120 acres to John. A valuation of $160 per acre was put upon the land. John procured a loan of $7,000 on the land, and gave his father his note for the balance of the agreed value. There seems to have been an understanding that the principal of this note should not be paid, but John paid the interest on it to his father. The $7,000 procured by the mortgage on John's land was used in buying a tract of 38 acres. The tract so purchased, with another of about 80 acres then owned by the father, is the land in controversy.

The witnesses testified that the land was to be the appellant's, and that he took possession of it and improved it; but the evidence fails to establish any completed arrangement, either of purchase or gift.

Concerning the matter, the appellant testified as follows:

"I moved onto the farm either in the spring of 1913 or 1914. The arrangements in regard to my moving onto the farm was between me and my father and me and my mother. It was bought for me, that place; it was bought for me. I went on there, on that place, as my own. My brother had his place, the same as I did. * * * There was something said about the title to the land, or a deed to the land, at that time. They wanted me to take the deed, but I didn't want the deed. I said, when I had anything coming, any gift coming, all right; I was able to make

my own way. That was practically all that was said. * * * In the conversation with my father and mother and my brother John, my brother John took part in that conversation. He said he wanted me to do it, the same as they did. He said I should go ahead and go on there like they wanted me to. There was something said about him at that time, too. They said we would both have the same places then,—the same kind of places,—120 acres in each one. * * * We were to have them farms at $160 per acre, as our part of the estate. They said just that would be our part of the estate. My father and mother said that. * * * John took his deed, but I did not take mine. There was something said about the deed to my place at that time. They wanted me to take a deed. I did not do it. My brother took his, but I did not want mine. It was said I was to get the deed any time I wanted it. They thought I ought to take it, and I didn't think I had. Well, that is what they said. They said I should go on there, and I was to get a deed any time I wanted it. Something was said about what support father should have,—that he might ask for some. If he never asked for any, he was not to receive any. * * * Nothing was said about rent. I did not get a deed from my father for this land. I didn't give him a note. Q. (By the court) Did I understand you correctly yesterday? I understood you to testify yesterday that you refused to take title to this land. A. Yes, sir. Nothing was said about my giving a note, and I never agreed to give a note. I could have had title any time I wanted it. That is what my father said. Q. Did you give him any reason for not taking a deed at that time,—what was said? A. I don't know just the words I said, but it was about the year 1917. He just came up there one time in June and just begged me, * * * my wife may recollect the time, along in June, and he just begged me. I did not give my father any reason for not taking the deed at that time. I don't know as I hardly did, only I just said that, when I had something coming and he wanted to give it to me, all good and well. He did not have any deed made out. He simply proposed to make a deed. Q. (By the court) Is that all the explanation you have for refusing to take the title to this land? A. I don't know. Q. That you would not take it except as a gift? A. I had always been pretty lucky. * * * It was said if

I wouldn't take the deed, I would get it at his death anyhow.
* * * Q. You testified that you made the same arrangements as
to this place that your brother made as to his place. A. My
father and mother made the arrangements. I didn't make any.
Q. You did not say you would take this arrangement, is that
it? A. I sure did, or I would not have went on there. My
father did not have any papers he had signed at either of these
times. I don't think he did. He did not show me any papers
he had signed. He asked me to go with him and sign them, and
I refused to go. Q. Did he want you to sign the papers? A.
Not as long as I didn't take the deed, he didn't. Q. (By the
court) How is that? A. Not as long as I did not take the deed,
he did not. If he gave me the deed, he wanted me to sign pa-
pers. Nothing was said about signing any note. I would have
to sign papers if I took the place, to take care of the $7,500 that
was on the place. I refused to sign those papers, and refused to
take a deed at that time. I testified yesterday I was to have
the place under the same arrangement that my brother took his.
My father wanted me to take a deed and go ahead with the deal
and finish it up, and I refused to do it. I refused to sign any
papers similar to those signed by my brother in his deal. No,
I didn't tell my father I wouldn't do it. I never did tell him
I would not do it. I never did do it, but I never told him I
wouldn't do it. He asked me to do it. I cannot give any other
reason than that I gave yesterday. * * * Nothing was said about
any other papers except a deed, only I was to take care of the
$7,500 that belonged to the place."

There was a mortgage on the land in controversy for $4,500.
A new loan was obtained for $7,500. With the money so pro-
cured, the first mortgage was paid, and part of the balance was
used to pay on the land. This mortgage for $7,500 is, appar-
ently, the one referred to by appellant in his testimony.

The other son, John, testified as follows:

"Q. What, if anything, was said in that conversation about
the place Orve [appellant] was to get, and who said it? A.
He was to get it at the same price as I got mine. My father
and mother said that,—both of them. Q. Was any price, or
value per acre, placed on these farms? A. $160, the same as I
gave for mine. I can't word the words that was said. My father

said the latter of the note would never need to be paid, and Orve's would be fixed the same way. That was the way they fixed the note,—the balance after I gave the $7,000 loan. I gave a note for the balance of my land. Q. What was said as to Orve's land, in that connection, if anything? A. His was fixed the same way. This referred to the 82 acres, before they bought the 40. It was said that Orve was to go on and build it up, and he would have it, the same as I was to do mine."

Albert Myers, the father, testified:

"There wasn't anything in particular said about what I should get out of this other farm [Orve's]. He was to keep up the place for the use of it. We did not have any decided price at all. We didn't talk about rent. He went on there, and I was to let him go on there with the intention of his farming it and keeping it up. He didn't deliver any of the grain to me. He paid me a little money a couple of times. We had no decided price. It wasn't agreed how much it was to be. He was to go ahead and take rent and improve the place with it. I did not make him a deed. I made a second loan on it, I guess. * * * I got the loan very soon after I bought the place."

It is undisputed that the father paid the taxes on the land in controversy until some two years before the trial; that he executed a waiver in connection with a drainage assessment against the land, and executed the $7,500 mortgage on it. It is clearly established that the fair rental value of the land during the time appellant occupied it exceeded the value of the improvements placed upon it by him.

The testimony falls far short of making out clearly, unequivocally, and definitely any arrangement whatever that would pass to the appellant any equitable title to the land. While the father testified that he bought the land for appellant, and intended him to have it, his testimony as a whole clearly shows that no arrangement was completed by which appellant acquired any title to it. The brother's testimony evidently relates to the arrangement that had been talked of in the family, that appellant should have the land on the same terms as he received his; and while it negatives any other arrangement or terms, he is clearly mistaken in saying that the arrangement was ever carried out. The testimony of appellant himself shows beyond ques-

tion that no completed arrangement was ever made, giving him any title, equitable or otherwise. His testimony does not show a gift or advancement. He testified that originally he refused to accept a deed to the land, and that, as late as 1917, after he had been upon the land three or four years, his father begged him to make the same arrangement that had been made with his brother John, and that he refused, and declined to bind himself to pay even the incumbrance on the land, or to accept it otherwise than as a gift. He then made no claim that the land had previously been given to him. His language was:

"I just said that, when I had something coming and he wanted to give it to me, all good and well."

There is no evidence whatever that it was ever offered to him as a gift or advancement, except upon condition that he should assume an obligation to pay the incumbrance, at least. No presumption that appellant accepted a beneficial gift can obtain in the face of his testimony that he refused to accept the title to the land upon the only terms on which it was offered. Whatever may have been the intentions or expectations of the parties as to the future or ultimate disposition of the land, it is clear that no present interest passed to the appellant, and he is in no position to question the validity of the mortgage given by the father to the Securities Company. The deed executed by him to the Securities Company was set aside in the lower court on grounds not involved in this appeal.

The decree is right, and is—*Affirmed*.

ARTHUR, C. J., STEVENS and DE GRAFF, JJ., concur.