VELMA ELDER, Appellee, v. GEORGE B. BROWN et al., Appellants.

**FRAUDS, STATUTE OF:** Real Property—Oral Contract—Proof Required. Oral contracts for the sale of land must be established by supporting testimony which is clear, definite, and unequivocal. Evidence held insufficient. (See Book of Anno., Vol. 1, Sec. 11286, Anno. 11 *et seq.*)

Headnote 1: 27 C. J. p. 388.

Headnote 1: 9 L. R. A. (N. S.) 508; 12 R. C. L. 974.

*Appeal from Jefferson District·Court.*—FRANCIS M. HUNTER, Judge.

FEBRUARY 8, 1927.

REHEARING DENIED JULY 1, 1927.

Action in equity to quiet title to real property. Decree as prayed, and defendants appeal.—*Reversed.*

*Richard C. Leggett,* for appellants.

*Thoma & Thoma,* for appellee.

STEVENS, J.—Laura Brown died intestate at Evanston, Wyoming, January 8, 1924, seized of the legal title to 30 acres of land in Jefferson County, Iowa, near Fairfield, and money in two banks in Evanston. She left surviving her two sons, George B. and Henry S. Brown, appellants herein, as her only heirs. Laura Brown was the daughter of Jane Stiles, who was twice married. A half sister of Laura's was the mother of the appellee, Velma Elder. Mrs. Stiles resided on the 30-acre tract for a great many years, and until her death, about December 10, 1917, at the age of 88 years. Laura Brown, at the time of her mother's death, and for many years prior thereto, was, or had been, employed in various public institutions as a cook. Mrs. Stiles was for many years in ill health, was disabled by rheumatic troubles from earning her living, and was supported by Laura. Upon the death of her mother, which occurred when she

was an infant, appellee went to live with her grandmother, Mrs. Stiles, where she made her home until she was 17 years of age, when she married. Up to the time of her marriage, she was also supported by Laura. Likewise, appellants George B. and Henry S. Brown lived with their grandmother, supported by Laura, until they reached maturity, or became old enough to make their own way. The 30-acre tract was not all acquired by Laura at one time. She purchased seven acres thereof in 1874, four acres in 1880, and a two-rod strip in 1886, and received a referee's deed to 18½ acres in 1919. It is claimed that she purchased the 18½-acre tract years ago, and paid therefor, but that title was taken in the name of Mrs. Stiles. It is also claimed that Laura intended and supposed that the deed was made to her mother for life, and that the legal title was conveyed in her. Upon her marriage, in 1903, appellee and her husband left the home of Mrs. Stiles, and lived in various places in Jefferson County until in 1904, when they purchased and moved a small residence upon the 18½-acre tract near the home of Mrs. Stiles, where they have since continuously resided.

On or about January 10, 1925, appellant served a notice to quit the premises upon appellee and her husband. Thereupon, this action was commenced, to quiet title. The petition is in the usual form of an action of this character. The answer is a general denial, together with a cross-petition, in which appellants also pray that title be quieted in them. Appellee bases her claim to title upon an alleged oral contract entered into with Laura Brown in 1904, in which the latter agreed to give her the property if she would continue to reside thereon and look after and care for Mrs. Stiles. It is conceded by the parties that appellee did take good care of her grandmother from the time she moved upon the tract until her death, in 1917. Laura seldom visited her mother, but, as stated, furnished her full support and maintenance, except for the services rendered by appellee.

The questions presented upon this appeal are largely questions of fact which are by no means of easy decision. The 30-acre tract is described as rough and broken, and possessing but a few small patches available for cultivation. Ransom Elder, the husband of appellee, is a laborer, but the evidence shows that he farmed the land one year. A barn was erected thereon, after appellee and her husband returned to take care of Mrs. Stiles.

The labor and material therefor, except the labor of Ransom, were paid for by Mrs. Stiles, who, in all probability, received the money from Laura for that purpose. The taxes were always paid by Laura up to the time of her death. No conveyance of any kind was ever made to appellee.

The evidence relied upon to establish the alleged oral contract consists of the testimony of appellee and of alleged statements by Laura to various friends and acquaintances of hers immediately after the death of Mrs. Stiles. The testimony of these witnesses is of a more or less unsatisfactory character. The only direct evidence of an oral contract between appellee and Laura appears in the testimony of the former. Appellee testified that Laura visited her mother in 1904, after she and her husband had moved upon the premises, and that, during a conversation with her, Laura said:

"You don't know what a relief that is going to be for me, for you folks to be here right near grandmother. I can go back out there and work, and not have to worry, thinking there is no one here to take care of her. If you will stay here and take care of mother, I will give you the home here."

Ransom testified that he overheard this conversation. The testimony of these witnesses was objected to by appellant, upon the grounds that it was "immaterial, irrelevant, and incompetent, being inadmissible under Section 11257 of the Code, and also under Section 11285." The sufficiency of the objection is challenged by appellee. As, in our opinion, appellee wholly failed to establish the contract claimed by her, the overruling of the objection was not prejudicial, and we do not pass upon the point raised.

The substance of the testimony of the various witnesses who detailed alleged conversations with Laura Brown is as follows:

Leah Hinton:

"Well, her and my husband was planning and talking about settling up the estate, how she was settling it with the rest of the heirs, and they planned—they spoke of an amount that she was going to give him, and she says, 'I am going—I gave Velma the home.' She said: 'I am not having to pay her money. I give Velma the home, and when I get through working, I am coming back and make my home with her.' She says: 'I can't

stay out there always. I give Velma the home. The rest I am going to straighten up with them just as fast as I can.' ''

Mary Williams:

''She had her meals there that day. Mrs. Brown said she was going to give Velma the place, for taking care of her mother. * * * She said she intended to give Velma the place, for taking care of her mother. She just said to all of us, right there, that she was going to give the place to Velma, for taking care of her mother. Mrs. Elder came down to see me about being a witness in this case. It was quite a little while ago. She didn't ask me what I would testify to. The first time I ever told anybody what I would testify to was to Mr. Thoma, yesterday. Q. She didn't say she had given the place to Velma,—she said she was going to? A. She said she gave it to Velma.''

Frank Williams:

''Was at the dinner table, and Mrs. Brown was there. Mrs. Elder seemed to feel awful bad over her grandmother's death, and she wouldn't come to the table, just as she was called, and Mrs. Brown said, 'I feel awful sorry for Velma.' She said she had 'took good care of my mother, and I have gave her this place for taking care of my mother.' That was at the dinner table. * * *   A. She said Velma had taken good care of her mother, 'and I have given her the place.' Q. Did she say, 'I have given her the place,' or 'expect to give her the place?' A. 'I have given her the place.' * * *  Q. She said she was going to give her the place? A. No, she said, 'I have given the place to Velma, for taking care of my mother.' Q. She didn't say whether she was going to give it to her by deed or will or how? A. No, sir. Q. Wasn't anything said about how she was going to do it? A. No, sir. Q. She didn't say, 'I have already made a deed to her for it?' A. She did not. She says, 'I have given it to her.' ''

H. S. Stark:

''This conversation occurred after I had been appointed administrator. During this conversation, she talked to me about trying to buy these different heirs off,—her brothers and sisters. She said that Velma Elder was the only one of the family that would stay there and do anything for her mother, and if it hadn't been for Velma, she could not have stayed away at this institution and worked there, because she would have had to

come home, to take care of her mother. She said, 'When I get through,—when I quit at the hospital, I am coming back to live with her.'' She said, 'I have given Velma a home right here.' She said she was going to pay her brothers and sisters off as cheap as she could. * * * She said, 'I have given Velma a home here.' She said she gave her a home, and that she was going to come back and live with Velma. I paid the taxes on this for Mrs. Elder. She sent the money for me to pay it, and I went and paid it. It was 1924 taxes.''

Perrin Reed:

''It was after the funeral. I think it was the next day after the funeral. I most generally went over to Elder's house along in the evening, or some of them was over to our place. Mrs. Brown told me: 'I gave this place to Velma for her home, because she stayed there all these years, and she has never got nothing. If it hadn't been for her staying here these years, I would have had to come home and take care of my mother myself.' * * * Q. You say she said to you that she was going to give this place to Velma? A. She didn't say she was going to,—she said she did give it to her. She gave it to her. Q. Did she say she gave it to her? A. She said she gave this place to Velma, for what she had done; she had never got anything for what she had done. Q. She didn't say that she had made a deed or made a will or anything of that kind? A. No. Q. Just simply that she gave it to her? A. Yes, sir.''

Hugh Scannell:

''I was out at the Elder place a day or so, and then I saw her again at Heston's. Talked with Laura Brown, the morning after her mother died, at Velma Elder's. She said that she was giving Velma that tract of land, for what she had done for her, for staying there and taking care of her mother.''

Appellee:

''She told me if I would stay there and take care of her mother, she would give me the home there. That was in 1904. She was here a week or two, or maybe three. * * * I did not see Laura Brown from the time of her visit here, in 1904, until the time of her mother's death, in 1917. When she came in 1917, it was in response to my telegram. The next morning after Grandmother Stiles' death,—I think that would be Tuesday morning, December 11, 1917,—I was in deep sorrow, of

course; for grandmother was really the only mother I ever knew; and I said of course my mission was over, and that I didn't think I could ever live there. 'Well,' she said, 'you will live here. You just stay and live it down.' She says, 'I will give you the home, for what you have done for my mother. If it hadn't been for you, I would have had to come here and stay, because I am sure none of the rest of them would have done it.' * * * And I knew that Laura Brown had to take care of the debts of Grandmother Stiles, and had to pay off these brothers and sisters. If it hadn't been for this, she would have stayed here then. She wouldn't have gone back. That is the main reason she went back to her work. I knew that whatever became of this road matter, the money was to go to her. Aunt Laura Brown and I had an arrangement that she was to come back here and make her home with us, as soon as she got these debts paid off; and she told me any time I couldn't pay the taxes, she would help me pay them. I contemplated that, after she quit work, she would come back to our place and make her home with us.''

The testimony of appellee as to the alleged contract, as printed in appellant's abstract, is:

''Q. Now what, if anything, further did Mrs. Brown say to you, on the occasion of her visit here in 1904, relative to that 30-acre tract and yourself? A. She told me that, if I would stay there and take care of her mother, she would give me a home there.''

It will be observed that all of the conversations referred to by these witnesses were had something like eight years before the trial, and that some of them testified that Laura said she had given the home to appellee, or that she intended to give it to her. None of the witnesses gave direct evidence as to the alleged oral contract relied upon.

Harriet Freshwater, a half sister of Laura Brown's, also testified to a conversation in 1917, as follows:

''I went part way home with her,—as far as Albia. We stopped at Ottumwa in the evening, and spent the night there. I know Mrs. Hinton,—formerly Mrs. Stiles. We spent the night at her home in Ottumwa. There was a conversation there, that evening, about the land that belonged to Mrs. Brown, and was located west of Fairfield. The conversation was that she was to buy out the heirs, and my brother was to get so much for his

share. Nothing was said about her giving land to anyone else. Not a word was mentioned in my presence, and I was there all of the time. I spent the night with Mrs. Brown, and at the time of the conversation about the land, I was present all the time; and I heard the promise made how much she was to give my brother for his share in the 18 acres. Mrs. Brown told me what she was going to do with the land. She said she was going to give it to her boys; that we were going to make our home there as long as we lived; she was going to build a place, and when she was gone, her boys was going to get the land,—her boys, Henry and George. She left surviving her as her heirs her boys, George Brown and Henry Brown. They are all the children that survived her.''

Charles Heston, a son of Harriet Freshwater's, testified to a conversation with Ransom Elder, sometime after the death of Laura Brown, as follows:

''A. I asked him what they were going to do with that land, and he said they would sell it. And I said, 'What do you want for it?' 'Well,' he said, 'I don't know; I haven't seen George yet.' He said, 'Why, do you want to buy it?' And I said, 'Yes, I would like to, if I could buy it worth the money.' 'Well,' he said, 'I will write to George, or see him, and try to get a price on it, and I will let you know, and try to sell it to you.' And Ransom said, 'Well, I would like to have the south half of it, anyway.' And I said, 'All right. If I can buy it, I will take the north half; then you can have the south half, so far as I am concerned.' And Ransom didn't say he wanted to buy it.''

George Brown testified to the following conversation with Ransom Elder after Laura's death:

''A. Well, he said like this: 'What are you boys going to do with the place?' I said, 'Ransom, I can't tell you until I talk to my brother.' My brother wasn't with me; he wasn't there. That ended it, as far as I can go. * * * That was all that was said. I said, 'I can't tell you until I have seen my brother, and see what he says.' He wanted to know what I thought it was worth, and I said, 'I couldn't tell you.' ''

Henry Brown testified to a conversation with appellee, in which it is claimed she asked him what they were going to do with the land; that he replied that she could stay there, as far

as he was concerned, until the place was sold, if they would pay the taxes.

George F. Stever testified, on behalf of defendant, that he had a conversation with Laura Brown in Evanston, Wyoming, with reference to the purchase of the land in controversy, and that she then said she did not want to sell it; that she expected to make a home there for Harriet (her half sister) and herself, as long as she should live; and that, upon her death, George and Henry could do with the land as they pleased.

The only taxes paid by appellee were the first half for one year, and a year or two after the death of Laura. Very shortly after the death of Mrs. Stiles, Laura commenced an action in the district court of Jefferson County, to partition the 18½-acre tract, record title to which was in the name of her mother. Appellee was made a party defendant in this action. Laura obtained conveyances from some of the heirs, but not all; and the land was sold to her at referee's sale.

About the same time, the county desired a right of way across the tract, for highway purposes. Laura left this matter to be looked after by H. S. Stark, who was the administrator of her mother's estate. A contract was later entered into between the county and Laura, in which the county agreed to pay to her, and later did pay, $600 damages. Appellee received no part of the proceeds of the referee's sale of the land, although, as heir at law of Mrs. Stiles, she had a one-fourteenth interest in the land.

We have set out the testimony with unusual fullness, in order that the questions of fact presented may be clearly understood. The rule as to the quantum of proof necessary to establish an oral contract for the purchase of land is substantially the same as that required to prove an oral gift thereof. *Myers v. Myers*, 197 Iowa 1137. Such contracts can be established only by clear, unequivocal, and definite proof. *Myers v. Myers*, supra; *Campbell v. Collins*, 133 Iowa 152; *Lembke v. Lembke*, 194 Iowa 808; *Casady v. Casady*, 184 Iowa 1241; *Runnels v. Anderson*, 186 Iowa 1370; *Hagerty v. Hagerty*, 186 Iowa 1329; *Farlow v. Farlow*, 154 Iowa 647.

The objection of appellant that the transaction is within the statute of frauds is not well taken, for the reason that there was a consummation of the oral contract, so far as appellee is con-

cerned, if any was ever entered into. *Hurst v. Jenkins,* 161 Iowa 414; *In re Estate of Choate,* 195 Iowa 715.

Does the evidence sustain the alleged oral contract? Appellee did not testify that Laura gave the property to her, but that she agreed that, if appellee would remain on the premises and take care of her grandmother, Laura would give it to her. In some of the conversations detailed, the witnesses testified that Laura said that she had given the property to appellee, while to others she said that she was going to give it to her. In most of the conversations detailed, Laura is made to say that she had given, or intended to give, appellee a home on the premises, or to give her the home. Surely, neither appellee nor Laura believed or understood that title to the 18½-acre tract, or to the portion taken for highway purposes, had passed to the former. The petition in the partition action is not before us, but we gather from the record that the interest of the respective parties was set out therein, including that of appellee. Testimony was introduced, tending to show that Laura said, after her mother's death, that she purchased and paid for the 18½-acre tract, and that the deed was either made to her mother by mistake, or that it should have given her only a life interest therein. The positive assertion of ownership of all the land by Laura in 1917 is wholly inconsistent with the claim now asserted by appellee. Appellee and her husband were induced to move upon the premises by Mrs. Stiles. All that Laura is shown to have done in the matter was to suggest the arrangement to her mother. She took no part in its consummation. Appellee paid no rent for the use of the premises, and incurred no expense in connection therewith, except to repair and enlarge the house which she and her husband moved thereon. Laura also repeatedly said that she intended to return to the place sometime, and make her home there. The testimony of her half sister as to her statement and declaration is not at all consistent with that of other witnesses. Evidence as to conversations in which the witness had little or no interest, occurring years before, is subject to many frailties. The ability to remember accurately what was said and to repeat the exact words is unusual. There is a broad distinction between the testimony of some of the witnesses, to the effect that Laura said she would give appellee *a* home on the premises in dispute, and the testimony of those who testified that she said she had given,

or would give, her *the* home. Testimony of this character is always regarded as more or less unreliable. Mere statements by Laura that she intended to give the place to appellee are, in themselves, of little value, and they afford little corroboration to the alleged oral agreement.

In our opinion, the evidence offered to prove the alleged contract is wholly insufficient to overcome the inference that must be drawn from the assertions by Laura of ownership of the land in 1917, and her consistent attitude maintained by her. She may have, and doubtless did, express appreciation for the care given to her mother by appellee. The arrangement had given her a comfortable home for many years, but it was practically the only home appellee had ever known, and naturally she was glad to accept it. No sacrifice was made by appellee when she moved upon the land. On the other hand, the right to a home, under the circumstances, was, no doubt, of considerable value to herself and her family.

The evidence is not of that certainty and definiteness necessary to sustain the decree, and it is—*Reversed.*

EVANS, C. J., and FAVILLE and VERMILION, JJ., concur.