AVIS C. LANE, Appellant, v. SAC COUNTY STATE BANK et al., Appellees.

No. 39975.

*Charles D. Goldsmith,* for appellant.

*Robert Elmer Long* and *Malcolm Currie,* for appellees.

WAGNER, J.—Lots 1, 2, and 3, in Block 7, in Platt's Addition to the City of Sac City, lie in a row, Lot 3 being west of Lots 1 and 2. In this action, the title to Lots 1 and 2 is involved, both the plaintiff and the defendant receiver claiming the title thereto, the plaintiff asking that the title be quieted in her, and the receiver praying that the title be quieted in him.

On March 31, 1919, J. A. (Joe) Lane received from the record owner a warranty deed for the aforesaid three lots, which instrument, on September 27, 1920, was filed for record in the office of the recorder of Sac County, and duly recorded. Joe Lane became heavily indebted to the Sac County State Bank, which, during the year 1925, passed into the hands of the defendant Andrew, superintendent of banking, as receiver. On May 28, 1926, the receiver obtained a judgment against Joe Lane on his indebtedness, in an amount in excess of $6,000. Execution issued, to make the amount of said judgment, and on July 6, 1926, the aforesaid three lots were sold on execution sale to the receiver, for the sum of $2,500. No redemption from said sale was made, and on July 7, 1927, a sheriff's deed was executed to the receiver. No contention is made relative to the judgment nor to the regularity of the proceedings leading up to and including the execution of the sheriff's deed. It is thus apparent that the record title to the real estate in controversy is in Andrew, as receiver of the Sac County State Bank.

The plaintiff, Avis C. Lane, is the mother of Joe Lane. The son remained unmarried until 1923 or 1924.

It is alleged in plaintiff's petition that she is the absolute

owner of the aforesaid Lots 1 and 2; that she acquired the ownership on the —— day of ——, 1919, by reason of an oral contract entered into between her and her son, Joe; that, immediately after her purchase of said lots, she took, and has ever since been in the possession thereof.

It is well settled that, to establish a parol contract of conveyance of real estate, the one so claiming must establish the contract by clear, satisfactory, unequivocal, definite, and convincing testimony, and that the acts claimed to be done thereunder must be equally clear and definite, and referable exclusively to the contract. *Myers v. Myers,* 197 Iowa 1137; *Williamson v. Williamson,* 4 Iowa (Cole) 279; *Briles v. Goodrich,* 116 Iowa 517; *Marti v. Ludeking,* 193 Iowa 500.

The testimony of the Lancs, father, mother, and son, is to the effect that, at some indefinite time during the latter part of the year 1919 or the fore part of the year 1920, an oral agreement was entered into between the plaintiff and her son, by which, for the consideration of $300, the mother became the owner of the two lots in controversy; that the son was, at that time, indebted to the mother for board, in an amount not fixed by the testimony, but stated generally as approximately $200, or a little in excess thereof; that the mother paid her son the difference between said amount and the $300. No deed has been executed by the son to the mother, and the only excuse given is that they didn't get around to it. There is no testimony as to the kind of instrument by which the title was to be conveyed by the son to the mother,— that is, whether by warranty deed or quitclaim deed; no testimony as to whether an abstract of title was to be furnished; no testimony as to when the title was to be conveyed, or when possession was to be taken. While the plaintiff claims to have been in the possession of the real estate, she has not been in the personal occupancy thereof.

At the time of the claimed transaction between the mother and the son, there were no improvements upon the property. A house was removed from other property and placed thereon. The party who moved the house testified that Joe employed him and paid him. In the purchase of the house, the son claims that he was acting for his mother. Relative to this transaction, the son, Joe, on cross-examination, testifies as follows:

"Q. What house was that that was moved on there? A. A house that we got of Truesdale. Q. Who bought the house, and who made the arrangements about the house? A. I do not know,—well, I couldn't say for sure whether it was I or my father that went over. Q. You were over there and saw Truesdale about the house? A. We went and looked at the house before there was any deal made. Q. Was that after you had this transaction with your mother? A . Yes, sir. Q. And the house was eventually purchased from Truesdale? A. Yes, sir. Q. And do you know for how much? A. Well, I am pretty sure it was $400. Q. Who paid for that house? A. Well, I believe that I gave him a check, at the time it was paid for, and there was $100 paid down on it. Q. You think you gave him a check for $100 as down payment? A. Yes, sir, I gave him a check, but I do not know whether it was mine or hers. I know it was a check, and that he got $100 down. Q. Who paid the balance of it? A. I believe she gave me the money, and I paid it. Q. Cash? A. I wouldn't say whether it was cash or in a check.''

After the house was placed upon the real estate in controversy, it was rented to various tenants, and it seems that the rent was sometimes paid to the mother, sometimes to the father, and sometimes to Joe. It is the contention of the Lanes that the money was ultimately received by the plaintiff.

One of the tenants went into possession of the property in October, 1922, and remained there continuously until September, 1926. It appears from his testimony that the transaction relative to the renting of the house was had with Tom Lane, the husband of the plaintiff and the father of Joe Lane. This tenant gave testimony that, in the negotiations for the renting of the property, the father offered to rent it for $15 per month for the three winter months and $20 per month for the balance of the year, and that he, the witness, refused to accept those terms, but made a counter offer of $15 a month throughout the year, and the father responded:

''He couldn't do that, and he told me that he would have to see Joe, and he would let me know later; and in a day or two, he came to me, and he said to me that Joe said it was all right,— he would rather have a renter to stay at $15 than to have them

move out and in; and he rented it to me, and I moved in, in a day or two after that."

No written leases were executed. Checks introduced in evidence as having been given in payment of the rent are made payable to the son, Joe. The father claims that whatever he did relative to the renting and collecting of the rent from the property was done for and in behalf of his wife. It is also shown that the tenant last above referred to did some carpenter work upon Lot 3, which unquestionably belongs to Joe, and that the amount owed him for said labor was deducted from the rent which he owed on the property occupied by him (the lots in controversy). It is shown that a sidewalk was constructed in the street around the property after the alleged transaction between the plaintiff and her son, and that the son took the steps to have the grade established. It is also shown that the property was liable for assessments for the construction of a sewer, and that, on September 22, 1920, the son, Joe, in consideration of his having the right to pay the assessments in installments, signed a waiver of illegality or irregularity as to the assessment. In 1921, 1923, and 1925, the three lots, the two in controversy and the one to the west thereof, were assessed to Joe, the oath to the assessment roll being subscribed by him. In 1924, Joe reported to an insurance agent that he wanted insurance on a couple of houses, and he accompanied the agent to the property in question, where the two houses were inspected and insurance policies were written thereon, in which he was named as beneficiary, and the same were delivered to and accepted by him.

On August 1, 1923, the son executed unto the bank a $4,000 note, and also a mortgage upon the three lots, securing the same. The examiner in charge of the affairs of the defunct bank testified that, in February, 1926, the son offered to execute a deed to the receiver for the three lots, if the latter would cancel the entire amount of his indebtedness to the bank.

To further elaborate upon the testimony would unduly extend the length of this opinion. The testimony in support of the claim of the plaintiff abounds in improbabilities and inconsistencies. When the usual and ordinary tests of credibility are applied to the evidence, it cannot be said that the plaintiff's claim

of title has been established. This was the view of the trial court.

Our holding as to the aforesaid matter makes it unnecessary to discuss other propositions urged in argument.

The decree of the trial court is clearly right, and the same is hereby affirmed.

The appellant's motion to strike appellee's amendment to appellant's abstract, which was ordered submitted with the case, is overruled.—*Affirmed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and MORLING, JJ., concur.